*Judge Hellerstein*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'09 CIV 7611

------------------------------------------------x

EMRE GEMICILIK DENIZCILIK TIC. LTD. STI.,

                                    Plaintiff,

-v-

MILITARY INSURANCE COMPANY,

                                    Defendant.

------------------------------------------------x

09 CV 7611 (AKH)

**VERIFIED COMPLAINT**

RECEIVED
SEP 01 2009
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, EMRE GEMICILIK DENIZCILIK TIC. LTD. STI., (hereinafter "EMRE

GEMICILIK"), by its attorneys, CHALOS & CO, P.C., as and for its Verified Complaint against

Defendant, MILITARY INSURANCE COMPANY (hereinafter "MILITARY"), alleges upon

information and belief as follows:

<u>JURISDICTION</u>

1.      The Court has subject matter jurisdiction by virtue that the underlying claim

herein is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules

of Civil Procedure and within the admiralty and maritime jurisdiction of this Court under 28

U.S.C. § 1333.

<u>THE PARTIES</u>

2.      At all times material hereto, Plaintiff, EMRE GEMICILIK, was and still is a

foreign business entity with a registered office at Sumko Sitesi A6 Blok D: 5 P.O. Box: 34742

Kozyatagi- Kadokoy, Istanbul, Turkey.

3.      At all times material hereto, Defendant, MILITARY, was and still is a foreign

business entity with a registered office at 121170 Moscow City, 4 Ostrovanaya St., Russia.

Chalos & Co ref:  2161.001

## FACTS AND CLAIM

4.      On or about April 10, 2008, EMRE GEMICILIK entered into a "Hull and Machinery" insurance contract as managers for the M/V BERIL 1 for the period of February 2008 through February 2009.  Defendant, MILITARY, underwrote twenty-five percent (25%) of the risk under the subject contract.  (A copy of the subject Hull and Machinery contract is annexed hereto as Exhibit "1").

5.      This marine insurance agreement is a maritime contract.

6.      Thereafter, on or about January 2-3, 2009, while the M/V BERIL 1 was en route from the Pork of Iskenderun, Turkey to Kerch, Ukraine, the main engine of the vessel broke down.

7.      As a result of the breakage, the M/V BERIL 1 had to be tugged by the SONDUREN 5 to a safe anchorage area.

8.      It was determined by the surveyor that the damage was caused by the breakage of a heating coil on the vessel.

9.      Due to the breakage, EMRE GEMICILIK incurred significant expenses for vessel repair, including, but not limited to parts; labor for dismantling, overhauling, cleaning, reconditioning, painting, and repairing the vessel; agency expenses for port fees, transit fines, and launch expenses; bunkers, marine gasoil, and lube oil consumption for the deviation; additional labor costs for the crew and Managers' Superintendant; and fees for the Hull & Machinery Surveyor.  These expenses totaled USD $371,206.60. (A copy of the surveyor's report including a summary of the aforementioned expenses is annexed hereto as Exhibit "2").

10.     In accordance with the Hull & Machinery agreement, MILITARY is responsible for 25% of the above referenced expenses, totaling USD $92,801.65.

Chalos & Co ref: 2161.001                    2

11.    Additionally, EMRE GEMICILIK incurred claims management expenses in the amount of USD $46,719.32.  In accordance with the subject agreement, MILITARY is responsible for 25% of the claims management expenses, totaling $11,679.83. (A copy of a summary of claims management expenses is annexed hereto as Exhibit "3").

12.    The damages described in paragraphs 9-11 of the Verified Complaint are all insured perils under the subject insurance agreement, and Plaintiff has otherwise met all requirements under the agreement.

13.    Despite EMRE GENICILIK's has repeatedly demands for payment of the outstanding damages, MILITARY has failed to make said payment.

14.    However, all other underwriters have paid their appropriate proportional expenses in accordance with the subject agreement.

15.    Pursuant to the terms of the above listed agreement, all disputes arising there under are to be submitted to the courts of England and/or Wales with English law to apply.

16.    Plaintiff has or will be commencing underlying legal proceedings within the English/Welsh courts shortly.

17.    This action is brought in order to obtain jurisdiction over Defendant and also to obtain security for Plaintiff's claims and in aid of English/Welsh court proceedings.

18.    English law provides that a prevailing party is entitled to interest, costs and legal fees.

19.    As best as can now be estimated, the Plaintiff EMRE GENICILIK expects to recover the following amounts in the English/Welsh court proceedings from Defendant MILITARY:

A.    Principal claim:                              *$ 104,481.48*

|   | | |   |
|---|---|---|---|
| B. | Estimated interest on Principal claim:<br>3 years at 7.5%, compounded quarterly | | $ 26,090.74 |
| C. | Estimated attorneys' fees: | | $ 50,000.00 |
| | **Total Claim** | | **$ 180,572.22** |

20.     Therefore, EMRE GENICILIK's total claim for breach of the maritime contract against Defendant MILITARY is in the aggregate USD $180,572.22.

<u>BASIS FOR ATTACHMENT</u>

21.     Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendant is believed to have or will have during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to, claimed by, or for the benefit of, the Defendant within this District held by various parties, as garnishees, including by not limited to electronic fund transfers.

22.     Defendant MILITARY is continuously engaged in international shipping and conducts business in U.S. Dollars.  Nearly all companies engaged in the international shipping industry transact business in U.S. Dollars and therefore regularly have assets in New York City. Dollars are the *lingua franca* of international commerce.

23.     All international U.S. dollar transfers are processed by intermediary banks in the United States, mainly in New York City.  The Clearing House Interbank Payment System represents that it processes 95% of those transfers.

24.    Plaintiff believes that some of these assets of Defendant, MILITARY, to wit: accounts; bank accounts; monies; charter hire; credits; debts owed to the defendant; effects; payments for bunkers, cargo, goods or services; debts; unmatured debts; bills of lading; payments from the purchasers of cargoes; freight and/or hire payments to or from owners of vessels, or charterers, to, from, or for the benefit of, Defendant and/or Clearing House Interbank Payment System (CHIPS) credits or funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including: ABN AMRO BANK, American Express Bank, Bank of America, Bank of China, Bank of New York, Bank of Tokyo Mitsubishi UFJ Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc., Citibank N/A, Credit Suisse Securities (USA) LLC, Deutsche Bank, HSBC (USA), JPMorgan Chase Bank, Mashreqbank, Societe Generale, Standard Chartered Bank, UBS AG, U.S. Bank, Wachovia Bank,  and Wells Fargo Bank.

WHEREFORE, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.    That since the Defendant cannot be found within the District, as set forth in the Declaration of George M. Chalos (*a copy of which is annexed hereto as Exhibit "4"*), and pursuant to Rule B and Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B and Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of the Defendant's tangible or intangible property or any other funds held by any garnishees in the district which are due and owing, or other property of, or for the benefit of, the Defendant, up to the amount of USD $180,572.22 to secure and satisfy the Plaintiff's claims, and that all persons claiming any interest in the same be

cited to appear and pursuant to Supplemental Admiralty Rule B and Rule E answer the matters

alleged in the Complaint;

    C.    That Plaintiff may have such other, further and different relief as may be just and

proper.


Dated: Oyster Bay, New York
       September 1, 2009

                       CHALOS & CO, P.C.
                       Attorneys for Plaintiff
                       EMRE GEMICILIK DENIZCILIK TIC. LTD. STI.

           By:          _____
                       George M. Chalos (GC-8693)
                       123 South Street
                       Oyster Bay, New York 11771
                       Tel: (516) 714-4300
                       Fax: (516) 750-9051
                       Email: gmc@chaloslaw.com

EXHIBIT 1

**KMD**

| | |
|---|---|
| Policy No | B1149TH000014I |
| Assured | Ermar Shipping |
| Type | Marine Hull Insurance |
| | Market Reform Contract |

| Unique Market Reference B1149TH000014I |
|---|
| For Lloyd's use |
| For ILU use |
| For LIRMA use |

Policy No.B1149 TH000014I

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

1

ОТ:          ТЕЛ:+74956243783          16 АПР. 2008 13:10    С. 2



UMR B1149TH0000141

| RISK DETAILS | |
|---|---|
| UNIQUE MARKET REFERENCE: | B1149TH0000141 |
| TYPE: | Marine Hull Insurance |
| FORM: | MAR 91 |
| ASSURED: | Ermar Shipping as Managers and/or Emre Gemicilik Denizcilik Tic Ltd Sti as Owners and/or as other parties as their respective rights and interests may appear. |
| ADDRESS: | TBA |
| PERIOD: | Vessel 1: 12 Months from 23rd February 2008<br>Vessel 2: Expected June 2008 to common fleet expiry |
| VESSELS | "Beril 1" +1 as per schedule attached. |
| INTEREST: | Hull & Materials, Engines and Machinery and everything connected therewith, valued as per schedule attached. |
| SUM INSURED: | 100% of the above values. |
| TRADING: | Institute Warranties 1.7.76 [CL.26], or held covered at terms to be agreed by leading underwriter. |
| CONDITIONS: | Institute Time Clauses Hulls 1.10.83 [Cl. 280].<br>Excluding collision absolutely,<br>Clause 1.2 deleted.<br>Clause 12 Deductible[s]: US\$ 75,000.00 each accident or occurrence.<br>General Average, Salvage, Salvage Charges to be adjusted in accordance with York/Antwerp Rules 1950, 1974 as amended 1990 or 1994 at owner's option.<br>Leased Equipment Clause as attached.<br>Pilots Non - Liability Clause as attached.<br>Affiliated Companies Clause as attached.<br>Radio and Aids to Navigation Clause as attached.<br>Passenger Equipment Clause as attached.<br>It is agreed that any ancilliary interests which exclude total loss of the vessel shall not be deemed to be a breach of the Disbursements Warranty irrespective of sums insured. |

K.M.Dastur and Company, Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

1



TEЛ:+74956243783                    16 ΑΠΡ. 2008 13:10    C. 3



UMR B1149TH0000141

| CONDITIONS CONTINUED: | Notwithstanding anything herein contained to the contrary it is understood and agreed that the vessel hereunder shall be considered fully insured for the purposes of contribution to General Average and Sue and Labour Expenses
Agreed to accept class certificates issued by sub/local offices of classification societies.
It is hereby agreed that should underwriters require evidence of the Assured's compliance with ISM at the time of an incident likely to give rise to a claim under the policy, the assured is required only to provide copies of the DOC and SMC to evidence such compliance with the ISM code.
Small G.A. Clause amount US$ 100,000
Including 10% profit continuity credit clause payable at inception subject to risk being renewed with the same underwriters at expiry and through the same brokers.
Including the interest of Mortgagees, if required, subject to Notice(s) of Assignment and/or Loss Payable Clause(s) as advised.
Institute Radioactive Contamination Exclusion Clause - Cl 356
Brokers Cancellation Clause and Payment of Premium Clause.
It is understood that insurers hereon will follow Lloyd Italico which is the claims leader for this account in respect of appointments of surveyors and claims decisions. |
| RATE: | As per schedule attached (Cancelling Returns Only) |

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750



:ОТ:                           ТЕЛ: +74956243783              16 АПР. 2008 13:11    C. 4



UMR B1149TH000014I

| EXPRESS WARRANTIES: | None |
|---|---|
| CHOICE OF LAW & JURISDICTION: | This insurance shall be governed by and construed according to the laws of England and Wales. The courts of England and Wales shall have exclusive jurisdiction of the parties hereto on all matters relating to this Reinsurance. |
| PREMIUM | As per schedule attached. |
| PAYMENT TERMS: | Quarterly |
| TAXES PAYABLE BY INSURED AND ADMINISTERED BY INSURED: | |
| RECORDING, TRANSMITTING & STORING INFORMATION | Where K.M.Dastur and Company Limited, London, England maintains risks and claims data/information/documents, K.M.Dastur and Company Limited, London, England may destroy the originals and hold risks and claims data/information/documents electronically. |
| INSURER CONTRACT DOCUMENTATION: | This Document details the Contract Terms entered into by the Insurer(s) and constitutes the Contract Document.<br><br>XIS will prepare Slip Policies &/or Policy(ies) where required to be signed through the XIS Bureaux on behalf of subscribing Lloyd's Insurers and Member Companies of the IUA. |

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

3



_ОТ:                          ТЕЛ:+74956243783              16 ΑΠΡ. 2008 13:11    C.5



UMR B1149TH0000141

INFORMATION

|   | VESSEL | TYPE | AGE | FLAG | CLASS | GRT | DWT | DED | H&M VALUE USD | H&M RATE % | PREMIUM USD |
|---|--------|------|-----|------|-------|-----|-----|-----|---------------|-----------|-------------|
| 1 | BERIL 1 | GC | 1982 | SLOVAKIA | TL | 5,106 | 8,306 | 75,000 | 4,500,000 | 1.275% | 57,375.00 |
| 2 | EVIN | GC | 1984 | SLOVAKIA | KR | 5,106 | 8,022 | 75,000 | 4,500,000 | 1.255% | 56,475.00 |
|   |        |      |     |      |       | 10,212 | 16,328 |        | 9,000,000 |           | 113,850.00 |

Vessels are being managed by Ermar shipping, Turkey, who presently operate around 4 other vessels.

Ermar have had a five year claims free record except for one claim except for one claim on 1st November 2006 in the amount USD 194,000 paid owing to a contract with pier as a result of heavy weather.

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

4

.OT:                        ТЕЛ:+74956243783            16 АПР. 2008 13:11    С.6



UMR B1149TH000014I

| SECURITY DETAILS | |
|---|---|
| **ORDER HEREON** | 25% of 100% |
| **BASIS OF WRITTEN LINES:** | Percentage of whole |
| **SIGNING PROVISIONS:** | In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the Insurers.<br><br>However:<br><br>a)In the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;<br><br>b)The signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the Insured and all Insurers whose lines are to be varied .The variation to the contracts will take effect only when all such Insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement. |
| **WRITTEN LINES:** | 25% of 100% |

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

5

.OT:    ТЕЛ:+74956243783    16 АПР. 2008 13:11    C. 7



UMR B1149TH000014I

| SUBSCRIPTION AGREEMENT | |
|---|---|
| **SLIP LEADER:** | Military Insurance Company |
| **BASIS OF AGREEMENT TO CONTRACT CHANGES:** | All Changes to be managed and agreed in accordance with the General Underwriters Agreement (GUA) (October 2001) and the Non Marine Schedule (October 2001).Non Marine Bureaux Markets to follow the agreement of the Slip Leader unless otherwise stated.<br><br>As regards Honeycombs/Slip Endorsements where full Market Approval is deemed not necessary within the provisions of the GUA than, when required K.M.Dastur and Company Limited may be permitted to Utilise Email Facilities to supply the 'follow' Underwriters with scanned copies of such Honeycombs/Slip Endorsements for their records. |
| **OTHER AGREEMENT PARTIES FOR CONTRACT CHANGES IF ANY:** | |
| **OTHER AGREEMENT PARTIES FOR CONTRACT CHANGES IF ANY:** | |
| **BASIS OF CLAIMS AGREEMENT:** | Claims to be managed in accordance with the Lloyd's 2006 Claims Scheme and IUA claims agreement practices.<br><br>Non Bureaux companies to agree claims in accordance with their own Claims Agreement. |
| **CLAIMS AGREEMENT PARTIES:** | Claims to be agreed by the Slip Leader and:<br>i) the first Lloyd's Syndicate in the event that the Slip Leader is a IUA company<br>ii) the first company in the event that the Slip Leader is a Lloyd's Syndicate<br>iii) Xchanging Claims Services where there is more than one participating Lloyd's managing agent<br>iv) All non-bureau insurers each for their own proportion as required |

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

6



ОТ:                    ТЕЛ:+74956243783        16 АПР. 2008 13:11   С.8



UMR B1149TH0000141

| CLAIMS ADMINISTRATION: | K.M.Dastur and Company Limited to enter claim advices into Class as required. All company market bureaux insurer(s) to use CLASS for Claims agreement. Claims to be managed in accordance with the Lloyd's 2006 Claims Scheme and IUA claims agreement practices. |
|---|---|
| RULES AND EXTENT OF ANY OTHER DELEGATED CLAIMS AUTHORITY: | None (unless specified by Underwriters) |
| EXPERT(S) FEES COLLECTION: | In respect of Claims Related Experts Fees:<br><br>XChanging (Expert Fees Services or Claims Services Fees Direct Service to be service provider for all Slip Security including overseas, as applicable.<br><br>In respect of all other Expert Fees Broker to collect fees.<br><br>Where the Broker collects any Expert Fees the following apply in all cases |
| | 1) Where the Broker holds monies received from the Insurer for onward payment to agents of the Insurer in respect of Claims Adjustment, Surveyor, Legal and similar Professional Fees ("Professional Fees"), the Broker will hold such monies as agent of the Insurer. |
| | 2) Pending Payment to the agents of the Insurer, the Broker will hold the Monies described in (1) above as the agent and trustee of the Insurer within it's Client Monies Account which will be a Non-Statutory Trust Account established in accordance with CASS 5.4(FSA Client Money Rules).<br><br>The Insurer hereby consents to such Monies being co-mingled with the Broker's other Client Monies.<br><br>The Insurer further consents to its rights with regard to monies held in the Brokers Client Monies Account being subordinated to those of the Broker's Clients, in accordance with CASS 5 and further agrees that any interest earned on said account will accrue to the Broker |
| EXPERT(S) FEES COLLECTION (CONTINUED): | 3) The Broker shall mean K.M.Dastur and Company Limited. The Insurer shall mean all Insurance and Reinsurance Companies or Lloyd's Managing Agents subscribing to this Contract. |

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

7



:DT:                    ТЕЛ:+74956243783          16 АПР. 2008 13:12   C. 9



UMR B1149THXX0014I

| SETTLEMENT DUE DATE: | |
|---|---|
| BUREAUX ARRANGEMENTS: | In the event of there being more than one Reinsured, Underwriters hereon agree to sign separate slip policy each reinsured if required and further agree allow allocation of security to individual Reinsured/s, as required. IUA Companies agree waive submission of policy document to XIS and authorise leading IUA Company to sign a collective policy on their behalf. Delinked accounts to be presented by K.M.Dastur and Company Limited to LPS/XIS (Ins-sure). Underwriter(s) agree to accept/settle accounts at rate of exchange declared by K.M.Dastur and Company Limited. Underwriter(s) to sign any deferred premium instalments as Additional Premium(s); however, any annual instalments to be allocated to respective year of account. Underwriter(s) hereby agree to permit Xchanging Ins-sure Services to take down For Declaration Only (FDO) signing for the purpose of issuing the policy, prior to the SDD.  Where settlement due date, Premium Payment Condition (PPC) or Premium Warranty (PPW) due date falls on a weekend or bank holiday, presentation to LPSO/XIS (Ins-Sure) or Underwriter(s) hereon as applicable on next working day will be deemed compliant with PPC or PPW.  Where the PPC/PPW is later than the SDD the SDD is automatically deemed updated to be the same as the PPC/PPW. PANS may be issued on a not equivalent downwards basis if required by K.M.Dastur and Company Limited.  IUA companies not domiciled in London agree authorise XIS slip endorsements without sight of Underwriters agreement.  K.M.Dastur and Company Limited to note on endorsement date of Underwriters written agreement. |

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

8

ОТ:                            ТЕЛ:+74956243783            16 АПР. 2008 13:12    С.10



UMR B1149TH0000014I

| NON-BUREAUX ARRANGEMENTS: | In the event of there being more than one Reinsured, Underwriters hereon agree to sign separate slip policy each reinsured if required and further agree allow allocation of security to individual Reinsured's as required. |
|---|---|
| | Underwriter(s) agree to accept/ settle accounts at rate of exchange declared by K.M.Dastur and Company Limited. |
| | Where settlement due date, Premium Payment Condition (PPC) or Premium Warranty (PPW) due date falls on a weekend or bank holiday, payment to Underwriter(s) hereon as applicable on next working day will be deemed compliant with PPC or PPW. |
| | Closings may be issued on a net equivalent downwards basis if required by K.M.Dastur and Company Limited. |

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

9



DT:                          TEΛ:+74956243783          16 AПP. 2008 13:12    C.11

UMR B1149TH0000141

| FISCAL AND REGULATORY | |
|---|---|
| TAX PAYABLE BY UNDERWRITERS: | None |
| COUNTRY OF ORIGIN: | |
| OVERSEAS BROKER: | None |
| SURPLUS LINES BROKER: | Not Applicable. |
| U.S. CLASSIFICATION: | Not Applicable. |
| ALLOCATION OF PREMIUM TO CODING: | |
| ALLOCATION OF PREMIUM TO YEAR OF ACCOUNT | |
| FSA CLIENT CLASSIFICATION: | |



K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

10



UMR B11491TH0000141

| BROKER REMUNERATION AND DEDUCTIONS SECTION | |
|---|---|
| IS FEE PAYABLE BY CLIENT: | None |
| TOTAL BROKERAGE: | 20.50% in all |
| OTHER DEDUCTIONS FROM PREMIUM: | None |

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

11



UMR-B1149TF00001411

**LEASED EQUIPMENT CLAUSE**

This insurance is extended to cover equipment and apparatus not owned by the Assured but installed upon the insured vessel, and for which the Assured has assumed liability whether such equipment or apparatus is of the nature of aids to navigation or communication or otherwise subject to all terms and conditions of this policy, but in no event shall the liability of the Underwriters exceed the Contractual Liability of the Assured for such equipment or apparatus. All such equipment or apparatus installed on the vessel but not owned by the Assured shall be included in the agreed insured value of the vessel.

LSW779 (04/94)

**PILOTS NON-LIABILITY CLAUSE**

This insurance shall not be prejudiced by reason of any agreement limiting or exempting the liability of Pilots and/or Tugs and/or Tow boats and/or their owners when the Assured and/or Charterers accept such contracts in accordance with established local practice or compelled to accept such contracts

LSW787 (04/94)

**AFFILIATED COMPANIES CLAUSE**

It is hereby understood and agreed that in the event of the insured vessel being chartered by an associate, subsidiary or affiliated company, this insurance may inure to the benefit of the charterers and may cover their liability if any. Provided however, that in the event of any claim being made by an associate, subsidiary or affiliated company under this clause it shall not be entitled to recover in respect of any liability to which it would not be subject if it were the owner of the vessel, nor to a greater extent than an owner would be entitled in such event to recover. It is further agreed that Underwriters hereon waive their rights of subrogation against such charterers, excepting to the extent that any such charteror is insured against the liability asserted.

LSW786 [04/94]

**SMALL GENERAL AVERAGE CLAUSE**

Owners have the option to claim general Average expenditure up to the amount of USD 100,000.00 without recourse to Cargo and/or Time Charterers and/or any other contributing interests. Adjusters' charges not deemed to be part of USD 100,000.00 referred to above. Policy to pay General Average up to USD 100,000.00 referred to above notwithstanding vessel subsequently becoming total loss prior to completion of voyage.

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750



:OT:      ТЕЛ:+74956243783      16 АПР. 2008 13:13    C. 14



UMR ……………

## RADIO AND AIDS TO NAVIGATION CLAUSE

Radio apparatus, optical equipment, echo sounders, navigating equipment and other apparatus or equipment used for the purpose of communication or as aids to navigation or safety devices, portable or otherwise, and any refrigerated stores (etc) whilst permanently installed in the insured vessel, together with cinematographical equipment consisting of projection machines, sound apparatus and motion picture film shall be covered under this policy and included within the agreed valuation of the Hull, even when not owned by the Assured, provided the Assured has assumed liability therefore: but the liability of underwriters [either as to amount or as to the risks covered] shall not exceed the Assured's liability or liability to which Underwriters would be subject if the property were fully owned by the Assured whichever shall be the least.

## PASSENGER EQUIPMENT CLAUSE

This insurance is extended to include, bunkers and/or spare bunkers, bar stores, equipment for passengers' amusements, saloon and passengers cabin fittings, equipment, furnishings and decorations as well as all other stores and supplies including stocks in vessel's shops, provided the same are owned by the Assured.

L5A79 1 [04/94]

## BROKERS CANCELLATION CLAUSE

In the event of the Assured, or their agents on whose instructions this insurance may have been effected, failing to pay K M Dastur and Company Limited the premium or any instalment thereof on the due date, this policy may be cancelled forthwith by K M Dastur and Company Limited giving to the underwriters notice in writing and the underwriters will thereupon return to K M Dastur and Company Limited pro rata premium from the date of ……… or from such later date as cancellation may be required in the said notice.

In the event of cancellation under this agreement or by virtue of curtailment of cover for any other reason whatever, K M Dastur and Company Limited shall be entitled to all brokerage or commissions under this insurance without regard to the time the cover was in force. This clause shall not prejudice or affect K M Dastur and Company Limited's lien on this insurance for any amounts remaining due to it from the Assured, whether in connection with this insurance or otherwise, or any other rights of K M Dastur and Company Limited against the assured.

## PAYMENT OF PREMIUM CLAUSE

Notwithstanding anything contained herein to the contrary, the premium or consideration for this insurance is payable by instalments as show as follows:

One quarter of the annual premium is due and payable 1 month after inception.
One quarter of the annual premium is due and payable 3 months after inception
One quarter of the annual premium is due and payable 6 months after inception
One quarter of the annual premium is due and payable 9 months after inception

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

13





UMR B1149TH0000141

K M Dastur and Company Limited, agents for the Assured, are specially authorised until further notice to receive payments on behalf of the underwriters of such instalments.

In the event of any instalment not being received prior to or within ten days after its due date, this insurance may be cancelled in accordance with the provisions of the Brokers Cancellation Clause.

In the event of a total loss covered hereunder, all future instalments shall immediately become due and payable and the underwriters shall be entitled to take credit therefore.

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

14





 UNR: B1▨▨▨▨▨▨▨▨▨

### (RE)INSURERS LIABILITY CLAUSE

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

LMA3333
21 June 2007



K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

15

ОТ:                    ТЕЛ:+74956243783          16 АПР. 2008 13:13    С. 17

UMR B1149TH000014I

SECURITY

25%    M L L I T A R Y   I N S U R A N C E   Co

10/4/8.

K.M.Dastur and Company Limited
Registered in England Under Number 3852840
Lloyd's Broker
Authorised and Regulated by the Financial Services Authority Number 310750

16



PLEASE RETURN THIS COPY DULY SIGNED

Insurance & Reinsurance Brokers SA

Marine Risk Insurance                    Underwriting year 2008

## COVER NOTE NO. 061/2008

**TYPE:**          MARINE HULL INSURANCE

**FORM:**          MAR 91

We hereby confirm we have effected the following contract of insurance in favour of Messrs:

### EMRE GEMICILK DENIZCILIK TIC. LTD. STI. (as Manager)
### SUMMIT NAVIGATION LTD (as Owner)

to cover following vessel for the period, amount at the conditions and rate as indicated hereinafter:

| Vessel | Built | DWT | Class | Flag | Insured Value 100% total value | A. Rate % |
|--------|-------|-----|-------|------|-------------------------------|-----------|
| BERIL 1 | 1982 | 8'306 | TL | SLOVAKIA | Usd.  4,500,000 | 1.461% |
| EVIN | 1984 | 8,022 | TL | SLOVAKIA | Usd.  4,500,000 | 1,386% |

Period:           12 months from 23th February 2008
                  M/V Evin – from date to be advise (June 2008) to fleet common expire.

Interest:         Hull & Materials, Engines and Machinery and everything connected therewith, valued as per schedule attached.

Sum Insured:      100% of the above values.

Trading:          Institute Warranties 1.7.76 [CL.26], or held covered at terms to be agreed by leading underwriter.

Conditions:       Institute Time Clauses Hulls 1.11.95 [Cl. 280], excluding RDC in full
                  Lines 94-95 deleted
                  Radio and Aids to Navigation Clause as attached.
                  Leased Equipment Clause as attached.
                  Passenger Equipment Clause as attached.
                  Pilots Non - Liability Clause as attached.
                  Helicopter Clause.
                  Affiliated Companies Clause as attached.
                  Small G.A. Clause amount US$ 100,000.
                  General Average, salvage, Salvage Charges to be adjusted in accordance with York/Antwerp Rules 1950, 1974 as amended 1990 or 1994 at owner's option.



Insurance & Reinsurance Brokers SA

Electronic Date Recognition Clause (ANIA Wording)
Institute Radioactive Contamination Exclusion Clause – (1/10/90)
Including interest of Mortgagees if and in terms as may be required.
Cancelling return only.

| Security: | | |
|---|---|---|
| | Lloyd Italico (Leader) | 20.00% |
| | Hemisphere Insurance | 40.00% |
| | MilInsurance | 25.00% |
| | Int'I Giordan Insurance | 5.00% |
| | Indian Int'I Insurance | 10.00% |
| | TOTAL | 100.00% |

## LEASED EQUIPMENT CLAUSE

This insurance is extended to cover equipment and apparatus not owned by the Assured but installed for use on the insured vessel, and for which the Assured has assumed liability whether such equipment or apparatus be in the nature of aids to navigation or communication or otherwise subject to all terms and conditions of this policy, but in no event shall the liability of the Underwriters exceed the Contractual Liability of the Assured for such equipment or apparatus. All such equipment or apparatus installed on the vessel but not owned by the Assured shall be included in the agreed insured value of the vessel.
LSW779 (04/94)

## PILOTS NON-LIABILITY CLAUSE

This insurance shall not be prejudiced by reason of any agreement limiting or exempting the liability of Pilots and/or Tugs and/or Tow boats and/or their owners when the Assured and/or Charterers accept such contracts in accordance with established local practice or compelled to accept such contracts
LSW787 (04/94)

## AFFILIATED COMPANIES CLAUSE

It is hereby understood and agreed that in the event of the insured vessel being chartered by an associate, subsidiary or affiliated company, this insurance may inure to the benefit of the charterers and may cover their liability if any. Provided however, that in the event of any claim being made by an associate, subsidiary or affiliated company under this clause it shall not be entitled to recover in respect of any liability to which it would not be subject if it were the owner of the vessel, nor to a greater extent than an owner would be entitled in such event to recover. It is further agreed that Underwriters hereon waive their rights of subrogation against such charterers, excepting to the extent that any such charterer is insured against the liability asserted.
LSW786 [04/94]


Insurance & Reinsurance Brokers SA

### SMALL GENERAL AVERAGE CLAUSE

Owners have the option to claim general Average expenditure up to the amount of US$ 100,000.00 without recourse to Cargo and/or Time Charterers and/or any other contributing interests. Adjusters' charges not deemed to be part of US$ 100,000.00 referred to above. Policy to pay General Average up to US$ 100,000.00 referred     to above notwithstanding vessel subsequently becoming total loss prior to completion of voyage.

### RADIO AND AIDS TO NAVIGATION CLAUSE

Radio apparatus and equipment, echo sounders, navigating equipment and other apparatus or equipment used for the purpose of communication or as aids to navigation or safety devices, portable cargo container [such as refrigerated boxes etc;] when permanently installed in the insured vessel, tank cleaning equipment, also equipment consisting of projection machines, sound apparatus and motion picture film shall be covered by this policy and included within the agreed valuation of the Hull, even when not owned by the Assured, provided the Assured has assumed liability therefore: but the liability of underwriters [either as to amount or as to the risks covered] shall not exceed the Assured's liability or liability to which Underwriters would be subject if the property were fully owned by the Assured whichever shall be the least.

### PASSENGER EQUIPMENT CLAUSE

This insurance is extended to include, bunkers and/or spare bunkers, bar stores, equipment for passengers' amusements, saloon and passengers cabin fittings, equipment, furnishings and decorations as well as all other stores and supplies including stocks in vessel's shops, provided the same are owned by the Assured.
LSA791 [04/94]

### BROKERS CANCELLATION CLAUSE

In the event of the Assured, or their agents on whose instructions this insurance may have been effected, failing to pay Sipex SA the premium or any instalment thereof on the due date, this policy may be cancelled forthwith by Sipex SA giving to the underwriters notice in writing and the underwriters will thereupon return to Sipex SA pro rata premium from the date of notice or from such later date as cancellation may be required in the said notice.

In the event of cancellation under this agreement or by virtue of curtailment of cover for any other reason whatever, Sipex SA shall be entitled to all brokerage or commissions under this insurance without regard to the time the cover was in force. This clause shall not prejudice or affect Sipex SA lien on this insurance for any amounts remaining due to it from the Assured, whether in connection with this insurance or otherwise, or any other rights of Sipex SA against the assured.



**Sipex**
Insurance & Reinsurance Brokers SA

### PAYMENT OF PREMIUM CLAUSE

Notwithstanding anything contained herein to the contrary, the premium or consideration for this insurance is payable by instalments as shown as follows :

One quarter of the annual premium is due and payable 1 by cash.
One quarter of the annual premium is due and payable 3 months after inception.
One quarter of the annual premium is due and payable 6 months after inception.
One quarter of the annual premium is due and payable 9 months after inception.

Sipex SA, agents for the Assured, are specially authorised until further notice to receive payments on behalf of the underwriters of such instalments.

In the event of any instalment not being received prior to or within ten days after its due date, this insurance may be cancelled in accordance with the provisions of the Brokers Cancellation Clause.

In the event of a total loss covered hereunder, all future instalments shall immediately become due and payable and the underwriters shall be entitled to take credit therefor.

Sipex
Insurance & Reinsurance Brokers SA

EMRE GEMİCİLİK
DENİZCİLİK TİCARET LİMİTED ŞİRKETİ
19 Mayıs Mah. ........ Sk. Sümko Sitesi
A-5 Blok D:7 KADIKÖY-İSTANBUL
Tel:(0216) 445 86 78 - Fax:(0216) 445 86 79
ULAŞ ...... V.D. 334 042 3972

**Sipex**

Insurance & Reinsurance Brokers SA

1/11/95   These clauses are purely illustrative. Different policy conditions may be agreed. The specimen clauses are intended to protect parties upon request, in particular: (a) in relation to any clause which excludes harm from the cover, insurers may agree a separate insurance policy covering such harms or may extend the clause to cover such events; (b) in relation to clauses making cover of certain risks subject to specific conditions each insurer may alter the said conditions".

(FOR USE ONLY WITH THE CURRENT MAR POLICY FORM)

### INSTITUTE TIME CLAUSES
### HULLS

This insurance is subject to English law and practice

| | | |
|---|---|---|
| 1 | **NAVIGATION** | 1 |
| | 1.1 | The Vessel is covered subject to the provisions of this insurance at all times and has leave to sail or navigate with or without pilots, to go on trial trips and to assist and tow vessels or craft in distress, but it is warranted that the Vessel shall not be towed, except as is customary or to the first safe port or place when in need of assistance, or undertake towage or salvage services under a contract previously arranged by the Assured and/or Owners and/or Managers and/or Charterers. This Clause 1.1 shall not exclude customary towage in connection with loading and discharging. | 2 3 4 5 6 7 |
| | 1.2 | This insurance shall not be prejudiced by reason of the Assured entering into any contract with pilots or for customary towage which limits or exempts the liability of the pilots and/or tugs and/or towboats and/or their owners when the Assured or their agents accept or are compelled to accept such contracts in accordance with established local law or practice. | 8 9 10 11 |
| | 1.3 | The practice of engaging helicopters for the transportation of personnel, supplies and equipment to and/or from the Vessel shall not prejudice this insurance. | 12 13 |
| | 1.4 | In the event of the Vessel being employed in trading operations which entail cargo loading or discharging at sea from or into another vessel (not being a harbour or inshore craft) no claim shall be recoverable under this insurance for loss of or damage to the Vessel or liability to any other vessel arising from such loading or discharging operations, including whilst approaching, lying alongside and leaving, unless previous notice that the Vessel is to be employed in such operations has been given to the Underwriters and any amended terms of cover and any additional premium required by them have been agreed. | 14 15 16 17 18 19 20 |
| | 1.5 | In the event of the Vessel sailing (with or without cargo) with an intention of being (a) broken up, or (b) sold for breaking up, any claim for loss of or damage to the Vessel occurring subsequent to such sailing shall be limited to the market value of the Vessel as scrap at the time when the loss or damage is sustained, unless previous notice has been given to the Underwriters and any amendments to the terms of cover, insured value and premium required by them have been agreed. Nothing in this Clause 1.5 shall affect claims under Clauses 8 and/or 10. | 21 22 23 24 25 26 |
| 2 | **CONTINUATION** | 27 |
| | Should the Vessel at the expiration of this insurance be at sea and in distress or missing, she shall, provided notice be given to the Underwriters prior to the expiration of this insurance, be held covered until arrival at the next port in good safety, or if in port and in distress until the Vessel is made safe, at a pro rata monthly premium. | 28 29 30 31 |
| 3 | **BREACH OF WARRANTY** | 32 |
| | Held covered in case of any breach of warranty as to cargo, trade, locality, towage, salvage services or date of sailing, provided notice be given to the Underwriters immediately after receipt of advices and any amended terms of cover and any additional premium required by them be agreed. | 33 34 35 |
| 4 | **CLASSIFICATION** | 36 |
| | 4.1 | It is the duty of the Assured, Owners and Managers at the inception of and throughout the period of this insurance to ensure that | 37 38 |
| | 4.1.1 | the Vessel is classed with a Classification Society agreed by the Underwriters and that her class within that Society is maintained, | 39 40 |
| | 4.1.2 | any recommendations requirements or restrictions imposed by the Vessel's Classification Society which relate to the Vessel's seaworthiness or to her maintenance in a seaworthy condition are complied with by the dates required by that Society. | 41 42 43 |
| | 4.2 | In the event of any breach of the duties set out in Clause 4.1 above, unless the Underwriters agree to the contrary in writing, they will be discharged from liability under this insurance as from the date of the breach provided that if the Vessel is at sea at such date the Underwriters' discharge from liability is deferred until arrival at her next port. | 44 45 46 47 |
| | 4.3 | Any incident condition or damage in respect of which the Vessel's Classification Society might make recommendations as to repairs or other action to be taken by the Assured, Owners or Managers must be promptly reported to the Classification Society. | 48 49 50 |
| | 4.4 | Should the Underwriters wish to approach the Classification Society directly for information and/or documents, the Assured will provide the necessary authorization. | 51 52 |


Insurance & Reinsurance Brokers SA

| | | | |
|---|---|---|---|
| 5 | **TERMINATION** | | 53 |

This Clause 5 shall prevail notwithstanding any provision whether written typed or printed in this insurance inconsistent therewith.  54 55

Unless the Underwriters agree to the contrary in writing, this insurance shall terminate automatically at the time of  56 57

5.1    change of the Classification Society of the Vessel, or change, suspension, discontinuance, withdrawal or expiry of her Class therein, or any of the Classification Society's periodic surveys becoming overdue unless an extension of time for such survey be agreed by the Classification Society, provided that if the Vessel is at sea such automatic termination shall be deferred until arrival at her next port. However where such change, suspension, discontinuance or withdrawal of her Class or where a periodic survey becoming overdue has resulted from loss or damage covered by Clause 6 of this insurance or which would be covered by an insurance of the Vessel subject to current Institute War and Strikes Clauses Hulls – Time such automatic termination shall only operate should the Vessel sail from her next port without the prior approval of the Classification Society or in the case of a periodic survey becoming overdue without the Classification Society having agreed an extension of time for such survey,  58 59 60 61 62 63 64 65 66 67

5.2    any change, voluntary or otherwise, in the ownership or flag, transfer to new management, or charter on a bareboat basis, or requisition for title or use of the Vessel, provided that, if the Vessel has cargo on board and has already sailed from her loading port or is at sea in ballast, such automatic termination shall if required be deferred, whilst the Vessel continues her planned voyage, until arrival at final port of discharge if with cargo or at port of destination if in ballast. However, in the event of requisition for title or use without the prior execution of a written agreement by the Assured, such automatic termination shall occur fifteen days after such requisition whether the Vessel is at sea or in port.  68 69 70 71 72 73 74

A pro rata daily net return of premium shall be made provided that a total loss of the Vessel, whether by insured perils or otherwise, has not occurred during the period covered by this insurance or any extension thereof.  75 76

| | | | |
|---|---|---|---|
| 6 | **PERILS** | | 77 |

6.1    This insurance covers loss of or damage to the subject-matter insured caused by  78

6.1.1    perils of the seas rivers lakes or other navigable waters  79

6.1.2    fire, explosion  80

6.1.3    violent theft by persons from outside the Vessel  81

6.1.4    jettison  82

6.1.5    piracy  83

6.1.6    contact with land conveyance, dock or harbour equipment or installation  84

6.1.7    earthquake volcanic eruption or lightning  85

6.1.8    accidents in loading discharging or shifting cargo or fuel.  86

6.2    This insurance covers loss of or damage to the subject-matter insured caused by  87

6.2.1    bursting of boilers breakage of shafts or any latent defect in the machinery or hull  88

6.2.2    negligence of Master Officers Crew or Pilots  89

6.2.3    negligence of repairers or charterers provided such repairers or charterers are not an Assured hereunder  90 91

6.2.4    barratry of Master Officers or Crew  92

6.2.5    contact with aircraft, helicopters or similar objects, or objects falling therefrom  93

provided that such loss or damage has not resulted from want of due diligence by the Assured, Owners, Managers or Superintendents or any of their onshore management.  94 95

6.3    Masters Officers Crew or Pilots not to be considered Owners within the meaning of this Clause 6 should they hold shares in the Vessel.  96 97

| | | | |
|---|---|---|---|
| 7 | **POLLUTION HAZARD** | | 98 |

This insurance covers loss of or damage to the Vessel caused by any governmental authority acting under the powers vested in it to prevent or mitigate a pollution hazard or damage to the environment, or threat thereof, resulting directly from damage to the Vessel for which the Underwriters are liable under this insurance, provided that such act of governmental authority has not resulted from want of due diligence by the Assured, Owners or Managers to prevent or mitigate such hazard or damage, or threat thereof. Master Officers Crew or Pilots not to be considered Owners within the meaning of this Clause 7 should they hold shares in the Vessel.  99 100 101 102 103 104

| | | | |
|---|---|---|---|
| 8 | **3/4THS COLLISION LIABILITY** | | 105 |

8.1    The Underwriters agree to indemnify the Assured for three-fourths of any sum or sums paid by the Assured to any other person or persons by reason of the Assured becoming legally liable by way of damages for  106 107 108

8.1.1    loss of or damage to any other vessel or property on any other vessel  109

8.1.2    delay to or loss of use of any such other vessel or property thereon  110

8.1.3    general average of, salvage of, or salvage under contract of, any such other vessel or property thereon,  111 112

where such payment by the Assured is in consequence of the Vessel hereby insured coming into collision with any other vessel.  113 114

8.2    The indemnity provided by this Clause 8 shall be in addition to the indemnity provided by the other terms and conditions of this insurance and shall be subject to the following provisions:  115 116

8.2.1    where the insured Vessel is in collision with another vessel and both vessels are to blame then, unless the liability of one or both vessels becomes limited by law, the indemnity under this Clause 8 shall be calculated on the principle of cross-liabilities as if the respective Owners had been compelled to pay to each other such proportion of each other's damages as may have been properly allowed in ascertaining the balance or sum payable by or to the Assured in consequence of the collision,  117 118 119 120 121 122

8.2.2    in no case shall the Underwriters' total liability under Clauses 8.1 and 8.2 exceed their proportionate part of three-fourths of the insured value of the Vessel hereby insured in respect of any one collision.  123 124 125

8.3    The Underwriters will also pay three-fourths of the legal costs incurred by the Assured or which the Assured may be compelled to pay in contesting liability or taking proceedings to limit liability, with the prior written consent of the Underwriters.  126 127 128

**Sipex**

Insurance & Reinsurance Brokers SA

| | | |
|---|---|---|
| **EXCLUSIONS** | | 129 |
| 8.4 | Provided always that this Clause 8 shall in no case extend to any sum which the Assured shall pay for or in respect of | 130 131 |
| 8.4.1 | removal or disposal of obstructions, wrecks, cargoes or any other thing whatsoever | 132 |
| 8.4.2 | any real or personal property or thing whatsoever except other vessels or property on other vessels | 133 |
| 8.4.3 | the cargo or other property on, or the engagements of, the insured Vessel | 134 |
| 8.4.4 | loss of life, personal injury or illness | 135 |
| 8.4.5 | pollution or contamination, or threat thereof, of any real or personal property or thing whatsoever (except other vessels with which the insured Vessel is in collision or property on such other vessels) or damage to the environment, or threat thereof, save that this exclusion shall not extend to any sum which the Assured shall pay for or in respect of salvage remuneration in which the skill and efforts of the salvors in preventing or minimising damage to the environment as is referred to in Article 13 paragraph 1(b) of the International Convention on Salvage, 1989 have been taken into account. | 136 137 138 139 140 141 142 |
| **9** | **SISTERSHIP** | 143 |
| | Should the Vessel hereby insured come into collision with or receive salvage services from another vessel belonging wholly or in part to the same Owners or under the same management, the Assured shall have the same rights under this insurance as they would have were the other vessel entirely the property of Owners not interested in the Vessel hereby insured; but in such cases the liability for the collision or the amount payable for the services rendered shall be referred to a sole arbitrator to be agreed upon between the Underwriters and the Assured. | 144 145 146 147 148 149 |
| **10** | **GENERAL AVERAGE AND SALVAGE** | 150 |
| 10.1 | This insurance covers the Vessel's proportion of salvage, salvage charges and/or general average, reduced in respect of any under-insurance, but in case of general average sacrifice of the Vessel the Assured may recover in respect of the whole loss without first enforcing their right of contribution from other parties. | 151 152 153 154 |
| 10.2 | Adjustment to be according to the law and practice obtaining at the place where the adventure ends, as if the contract of affreightment contained no special terms upon the subject; but where the contract of affreightment so provides the adjustment shall be according to the York-Antwerp Rules. | 155 156 157 |
| 10.3 | When the Vessel sails in ballast, not under charter, the provisions of the York-Antwerp Rules, 1994 (excluding Rules X(a), XX and XXI) shall be applicable, and the voyage for this purpose shall be deemed to continue from the port or place of departure until the arrival of the Vessel at the first port or place thereafter other than a port or place of refuge or a port or place of call for bunkering only. If at any such intermediate port or place there is an abandonment of the adventure originally contemplated the voyage shall thereupon be deemed to be terminated. | 158 159 160 161 162 163 |
| 10.4 | No claim under this Clause 10 shall in any case be allowed where the loss was not incurred to avoid or in connection with the avoidance of a peril insured against. | 164 165 |
| 10.5 | No claim under this Clause 10 shall in any case be allowed for or in respect of | 166 |
| 10.5.1 | special compensation payable to a salvor under Article 14 of the International Convention on Salvage, 1989 or under any other provision in any statute, rule, law or contract which is similar in substance | 167 168 169 |
| 10.5.2 | expenses or liabilities incurred in respect of damage to the environment, or the threat of such damage, or as a consequence of the escape or release of pollutant substances from the Vessel, or the threat or such escape or release. | 170 171 172 |
| 10.6 | Clause 10.5 shall not however exclude any sum which the Assured shall pay to salvors for or in respect of salvage remuneration in which the skill and efforts of the salvors in preventing or minimising damage to the environment as is referred to in Article 13 paragraph 1(b) of the International Convention on Salvage, 1989 have been taken into account. | 173 174 175 176 |
| **11** | **DUTY OF ASSURED (SUE AND LABOUR)** | 177 |
| 11.1 | In case of any loss or misfortune it is the duty of the Assured and their servants and agents to take such measures as may be reasonable for the purpose of averting or minimising a loss which would be recoverable under this insurance. | 178 179 180 |
| 11.2 | Subject to the provisions below and to Clause 12 the Underwriters will contribute to charges properly and reasonably incurred by the Assured their servants or agents for such measures. General average, salvage charges (except as provided for in Clause 11.5), special compensation and expenses as referred to in Clause 10.5 and collision defence or attack costs are not recoverable under this Clause 11. | 181 182 183 184 |
| 11.3 | Measures taken by the Assured or the Underwriters with the object of saving, protecting or recovering the subject-matter insured shall not be considered as a waiver or acceptance of abandonment or otherwise prejudice the rights of either party. | 185 186 187 |
| 11.4 | When expenses are incurred pursuant to this Clause 11 the liability under this insurance shall not exceed the proportion of such expenses that the amount insured hereunder bears to the value of the Vessel as stated herein, or to the sound value of the Vessel at the time of the occurrence giving rise to the expenditure if the sound value exceeds that value. Where the Underwriters have admitted a claim for total loss and property insured by this insurance is saved, the foregoing provisions shall not apply unless the expenses of suing and labouring exceed the value of such property saved and then shall apply only to the amount of the expenses which is in excess of such value. | 188 189 190 191 192 193 194 |
| 11.5 | When a claim for total loss of the Vessel is admitted under this insurance and expenses have been reasonably incurred in saving or attempting to save the Vessel and other property and there are no proceeds, or the expenses exceed the proceeds, then this insurance shall bear its pro rata share of such proportion of the expenses, or of the expenses in excess of the proceeds, as the case may be, as may reasonably be regarded as having been incurred in respect of the Vessel, excluding all special compensation and expenses as referred to in Clause 10.5; but if the Vessel be insured for less than its sound value at the time of the occurrence giving rise to the expenditure, the amount recoverable under this clause shall be reduced in proportion to the under-insurance. | 195 196 197 198 199 200 201 202 |
| 11.6 | The sum recoverable under this Clause 11 shall be in addition to the loss otherwise recoverable under this insurance but shall in no circumstances exceed the amount insured under this insurance in respect of the Vessel. | 203 204 205 |
| **12** | **DEDUCTIBLE** | 206 |
| 12.1 | No claim arising from a peril insured against shall be payable under this insurance unless the aggregate of all such claims arising out of each separate accident or occurrence (including claims under Clauses 8, 10 and 11) exceeds the deductible amount agreed in which case this sum shall be deducted. Nevertheless the expense of sighting the bottom after stranding, if reasonably incurred specially for that purpose, shall be paid even if no damage be found. This Clause 12.1 shall not apply to a claim for total or constructive total loss of the Vessel or, in the event of such claim, to any associated claim under Clause 11 arising from the same accident or occurrence. | 207 208 209 210 211 212 213 |

*(Continued)*



**SIPEX**
Insurance & Reinsurance Brokers SA

12.2   Claims for damage by heavy weather occurring during a single sea passage between two successive ports shall be treated as being due to one accident. In the case of such heavy weather extending over a period not wholly covered by this insurance the deductible to be applied to the claim recoverable hereunder shall be the proportion of the above deductible that the number of days of such heavy weather falling within the period of this insurance bears to the number of of days of heavy weather during the single sea passage. The expression "heavy weather" in this Clause 12.2 shall be deemed to include contact with floating ice.    214 215 216 217 218 219 220

12.3   Excluding any interest comprised therein, recoveries against any claim which is subject to the above deductible shall be credited to the Underwriters in full to the extent of the sum by which the aggregate of the claim unreduced by any recoveries exceeds the above deductible.    221 222 223

12.4   Interest comprised in recoveries shall be apportioned between the Assured and the Underwriters, taking into account the sums paid by the Underwriters and the dates when such payments were made, notwithstanding that by the addition of interest the Underwriters may receive a larger sum than they have paid.    224 225 226 227

**13   NOTICE OF CLAIM AND TENDERS**    228

13.1   In the event of accident whereby loss or damage may result in a claim under this insurance, notice must be given to the Underwriters promptly after the date on which the Assured, Owners or Managers become or should have become aware of the loss or damage and prior to survey so that a surveyor may be appointed if the Underwriters so desire.    229 230 231 232

If notice is not given to the Underwriters within twelve months of that date unless the Underwriters agree to the contrary in writing, the Underwriters will be automatically discharged from liability for any claim under this insurance in respect of or arising out of such accident or the loss or damage.    233 234 235

13.2   The Underwriters shall be entitled to decide the port to which the Vessel shall proceed for docking or repair (the actual additional expense of the voyage arising from compliance with the Underwriters' requirements being refunded to the Assured) and shall have a right of veto concerning a place of repair or a repairing firm.    236 237 238 239

13.3   The Underwriters may also take tenders or may require further tenders to be taken for the repair of the Vessel. Where such a tender has been taken and a tender is accepted with the approval of the Underwriters, an allowance shall be made at the rate of 30% per annum on the insured value for time lost between the despatch of the invitations to tender required by the Underwriters and the acceptance of a tender to the extent that such time is lost solely as the result of tenders having been taken and provided that the tender is accepted without delay after receipt of the Underwriters' approval.    240 241 242 243 244 245 246

Due credit shall be given against the allowance as above for any amounts recovered in respect of fuel and store and wages and maintenance of the Master Officers and Crew or any member thereof, including amounts allowed in general average, and for any amounts recovered from third parties in respect of damages for detention and/or loss of profit and/or running expenses, for the period covered by the tender allowance or any part thereof.    247 248 249 250 251

Where a part of the cost of the repair of damage other than a fixed deductible is not recoverable from the Underwriters allowance shall be reduced by a similar proportion.    252 253

13.4   In the event of failure by the Assured to comply with the conditions of Clauses 13.2 and/or 13.3 a deduction of 15% shall be made from the amount of the ascertained claim.    254 255

**14   NEW FOR OLD**    256

Claims payable without deduction new for old.    257

**15   BOTTOM TREATMENT**    258

In no case shall a claim be allowed in respect of scraping gritblasting and/or othersurface preparation or painting of the Vessel's bottom except that    259 260

15.1   gritblasting and/or other surface preparation of new bottom plates ashore and supplying and applying any "shop" primer thereto,    261 262

15.2   gritblasting and/or other surface preparation of:    263

the butts or area of plating immediately adjacent to any renewed or refitted plating damaged during the course of welding and/or repairs,    264 265

areas of plating damaged during the course of fairing, either in place or ashore,    266

15.3   supplying and applying the first coat of primer/anti-corrosive to those particular areas mentioned in 15.1 and 15.2 above,    267 268

shall be allowed as part of the reasonable cost of repairs in respect of bottom plating damaged by an insured peril.    269 270

**16   WAGES AND MAINTENANCE**    271

No claim shall be allowed, other than in general average, for wages and maintenance of the Master Officers and Crew or any member thereof, except when incurred solely for the necessary removal of the Vessel from one port to another for the repair of damage covered by the Underwriters, or for trial trips for such repairs, and then only for such wages and maintenance as are incurred whilst the Vessel is under way.    272 273 274 275

**17   AGENCY COMMISSION**    276

In no case shall any sum be allowed under this insurance either by way of remuneration of the Assured for time and trouble taken to obtain and supply information or documents or in respect of the commission or charges of any manager, agent, managing or agency company or the like, appointed by or on behalf of the Assured to perform such services.    277 278 279 280

**18   UNREPAIRED DAMAGE**    281

18.1   The measure of indemnity in respect of claims for unrepaired damage shall be the reasonable depreciation in the market value of the Vessel at the time this insurance terminates arising from such unrepaired damage, but not exceeding the reasonable cost of repairs.    282 283 284

18.2   In no case shall the Underwriters be liable for unrepaired damage in the event of a subsequent total loss (whether or not covered under this insurance) sustained during the period covered by this insurance or any extension thereof.    285 286 287

18.3   The Underwriters shall not be liable in respect of unrepaired damage for more than the insured value at the time this insurance terminates.    288 289

**Sipex**

Insurance & Reinsurance Brokers SA

| | | | |
|---|---|---|---|
| **19** | **CONSTRUCTIVE TOTAL LOSS** | | 290 |
| | 19.1 | In ascertaining whether the Vessel is a constructive total loss, the insured value shall be taken as the repaired value and nothing in respect of the damaged or break-up value of the Vessel or wreck shall be taken into account. | 291 292 293 |
| | 19.2 | No claim for constructive total loss based upon the cost of recovery and/or repair of the Vessel shall be recoverable hereunder unless such cost would exceed the insured value. In making this determination, only the cost relating to a single accident or sequence of damages arising from the same accident shall be taken into account. | 294 295 296 297 |
| **20** | **FREIGHT WAIVER** | | 298 |
| | In the event of total or constructive total loss no claim to be made by the Underwriters for freight whether notice of abandonment has been given or not. | | 299 300 |
| **21** | **ASSIGNMENT** | | 301 |
| | No assignment of or interest in this insurance or in any moneys which may be or become payable thereunder is to be binding on or recognised by the Underwriters unless a dated notice of such assignment or interest signed by the Assured, and by the assignor in the case of subsequent assignment, is endorsed on the Policy and the Policy with such endorsement is produced before payment of any claim or return of premium thereunder. | | 302 303 304 305 306 |
| **22** | **DISBURSEMENTS WARRANTY** | | 307 |
| | 22.1 | Additional insurances as follows are permitted: | 308 |
| | 22.1.1 | *Disbursements, Managers' Commissions, Profits or Excess or Increased Value of Hull and Machinery.* A sum not exceeding 25% of the value stated herein. | 309 310 |
| | 22.1.2 | *Freight, Chartered Freight or Anticipated Freight, insured for time.* A sum not exceeding 25% of the value as stated herein less any sum insured, however described, under 22.1.1. | 311 312 |
| | 22.1.3 | *Freight or Hire, under contracts for voyage.* A sum not exceeding the gross freight or hire for the current cargo passage and next succeeding cargo passage (such insurance to include, if required, a preliminary and an intermediate ballast passage) plus the charges of insurance. In the case of a voyage charter where payment is made on a time basis, the sum permitted for insurance shall be calculated on the estimated duration of the voyage, subject to the limitation of two cargo passages as laid down herein. Any sum insured under 22.1.2 to be taken into account and only the excess thereof may be insured, which excess shall be reduced as the freight or hire is advanced or earned by the gross amount so advanced or earned. | 313 314 315 316 317 318 319 320 |
| | 22.1.4 | *Anticipated Freight if the Vessel sails in ballast and not under Charter.* A sum not exceeding the anticipated gross freight on next cargo passage, such sum to be reasonably estimated on the basis of the current rate of freight at time of insurance plus the charges of insurance. Any sum insured under 22.1.2 to be taken into account and only the excess thereof may be insured. | 321 322 323 324 |
| | 22.1.5 | *Time Charter Hire or Charter Hire for Series of Voyages.* A sum not exceeding 50% of the gross hire which is to be earned under the charter in a period not exceeding 18 months. Any sum insured under 22.1.2 to be taken into account and only the excess thereof may be insured, which excess shall be reduced as the hire is advanced or earned under the charter by 50% of the gross amount so advanced or earned but the sum insured need not be reduced while the total of the sums insured under 22.1.2 and 22.1.5 does not exceed 50% of the gross hire still to be earned under the charter. An insurance under this Section may begin on the signing of the charter. | 325 326 327 328 329 330 331 |
| | 22.1.6 | *Premiums.* A sum not exceeding the actual premiums of all interests insured for a period not exceeding 12 months (excluding premiums insured under the foregoing sections but including, if required, the premium or estimated calls on any Club or War etc. Risk insurance) reducing pro rata monthly. | 332 333 334 335 |
| | 22.1.7 | *Returns of Premium.* A sum not exceeding the actual returns which are allowable under any insurance but which would not be recoverable thereunder in the event of a total loss of the Vessel whether by insured perils or otherwise. | 336 337 338 |
| | 22.1.8 | *Insurance irrespective of amount against:* Any risks excluded by Clauses 24, 25, 26 and 27 below. | 339 340 |
| | 22.2 | Warranted that no insurance on any interests enumerated in the foregoing 22.1.1 to 22.1.7 in excess of the amounts permitted therein and no other insurance which includes total loss of the Vessel P.P.I., F.I.A., or subject to any other like term, is or shall be effected to operate during the currency of this insurance by or for account of the Assured, Owners, Managers or Mortgagees. Provided always that a breach of this warranty shall not afford the Underwriters any defence to a claim by a Mortgagee who has accepted this insurance without knowledge of such breach. | 341 342 343 344 345 346 |
| **23** | **RETURNS FOR LAY-UP AND CANCELLATION** | | 347 |
| | 23.1 | To return as follows: | 348 |
| | 23.1.1. | pro rata monthly net for each uncommenced month if this insurance be cancelled by agreement, | 349 |
| | 23.1.2 | for each period of 30 consecutive days the Vessel may be laid up in a port or in a lay-up area provided such port or lay-up area is approved by the Underwriters | 350 351 |
| | | (a) .................................................. per cent net not under repair | 352 |
| | | (b) .................................................. per cent net under repair. | 353 |
| | 23.1.3 | The Vessel shall not be considered to be under repair when work is undertaken in respect of ordinary wear and tear of the Vessel and/or following recommendations in the Vessel's Classification Society survey, but any repairs following loss of or damage to the Vessel or involving structural alterations, whether covered by this insurance or otherwise shall be considered as under repair. | 354 355 356 357 358 |
| | 23.1.4 | If the Vessel is under repair during part only of a period for which a return is claimable, the return shall be calculated pro rata to the number of days under 23.1.2 (a) and (b) respectively. | 359 360 |
| | 23.2 | PROVIDED ALWAYS THAT | 361 |
| | 23.2.1 | a total loss of the Vessel, whether by insured perils or otherwise, has not occurred during the period covered by this insurance or any extension thereof | 362 363 |
| | 23.2.2 | in no case shall a return be allowed when the Vessel is lying in exposed or unprotected waters, or in a port or lay-up area not approved by the Underwriters | 364 365 |
| | 23.2.3 | loading or discharging operations or the presence of cargo on board shall not debar returns but no return shall be allowed for any period during which the Vessel is being used for the storage of cargo or for lightering purposes | 366 367 368 |
| | 23.2.4 | in the event of any amendment of the annual rate, the above rates of return shall be adjusted accordingly. | 369 370 |



Insurance & Reinsurance Brokers SA

23.2.5   in the event of any return recoverable under this Clause 23 being based on 30 consecutive days   371
which fall on successive insurances effected for the same Assured, this insurance shall only be   372
liable for an amount calculated at pro rata of the period rates 23.1.2(a) and/or (b) above for the   373
number of days which come within the period of this insurance and to which a return is actually   374
applicable. Such overlapping period shall run, at the option of the Assured, either from the first   375
day on which the Vessel is laid up or the first day of a period of 30 consecutive days as provided   376
under 23.1.2(a) or (b) above.   377

The following clauses shall be paramount and shall override anything contained in this insurance inconsistent   378
therewith.   379

**24  WAR EXCLUSION**   380
In no case shall this insurance cover loss damage liability or expense caused by   381
24.1   war civil war revolution rebellion insurrection, or civil strife arising therefrom, or any hostile act by   382
    or against a belligerent power   383
24.2   capture seizure arrest restraint or detainment (barratry and piracy excepted), and the consequences   384
    thereof or any attempt thereat   385
24.3   derelict mines torpedoes bombs or other derelict weapons of war.   386

**25  STRIKES EXCLUSION**   387
In no case shall this insurance cover loss damage liability or expense caused by   388
25.1   strikers, locked-out workmen, or persons taking part in labour disturbances, riots or civil commotions   389
25.2   any terrorist or any person acting from a political motive.   390

**26  MALICIOUS ACTS EXCLUSION**   391
In no case shall this insurance cover loss damage liability or expense arising from   392
26.1   the detonation of an explosive   393
26.2   any weapon of war   394
and caused by any person acting maliciously or from a political motive.   395

**27  RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE**   396
In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or   397
contributed to by or arising from   398
27.1   ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear   399
    waste or from the combustion of nuclear fuel   400
27.2   the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear   401
    installation, reactor or other nuclear assembly or nuclear component thereof   402
27.3   any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or   403
    radioactive force or matter.   404



CL. 280.   *Sold by Witherby & Co. Ltd., London. — & Copyright — The Institute of London Underwriters*

Via Vedeggio 1, C.P. 435, 6928 Manno, Svizzera

EXHIBIT 2

STUDIO TECNICO NAVALE ANSALDO

No. 09/4595/MG/dm

M/V  " BERIL 1 "

I N D E X

| | Page |
|---|---|
| Foreword | 1 |
| Narrative | 2 |
| Diary | 6 |
| Ascertainment of damage and repairs | 8 |
| Main characteristics | 9 |
| General conditions | 11 |
| Class position | 13 |
| Assistance rendered by the tug | 16 |
| Damage and repairs | 17 |
| Cause | 19 |
| Examination of claims | 20 |
| Conclusion | 32 |

\*

This Report consists of no. 32 pages
and no. 12 enclosures, as well as a folder containing Owner's claim documents
submitted under separate cover.

\*\*\*

STUDIO TECNICO NAVALE ANSALDO

No. 09/4595/MG/dm

Genoa, 20 April 2009

M/V  " BERIL 1 "

Occurrence : 02.01.09 – In navigation - Main Engine damage

REPORT OF SURVEY

We would refer hereinafter regarding instructions received from Messrs. "LLOYD ITALICO" and others, as H&M Underwriters of the M/V " BERIL 1 " and namely to:

-   attend in relation to the subject occurrence, on behalf of the interested parties;

-   ascertain the damages and give our opinion on their alleged cause;

-   evaluate and establish their amount;

-   study the best technical and economic solution for the necessary repairs in order to restore the vessel to her full efficiency;

-   survey the repairs;

-   analyse and classify the documentation of expenses submitted by the Insured;

-   issue our final Report of Survey.

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)


N A R R A T I V E
(According to Deck and Engine Log Books and to what learnt and ascertained during our attendances. Times are local times.)

On 30 December 2008, the "BERIL 1" [General Cargo], built in 1982, GRT 5,106, Slovakian flag, Turk Loydu Class, Master Capt. Orhan Binay, departed from Iskenderun[1] (Turkey), bound for Kerch (Ukraine) , in ballast.

Drafts at departure: 2.25 m forward and 4.30 m aft.

The navigation proceeded regularly without any anomaly to the Main Engine (M.E.).

In the night of 02.01.09 the vessel commenced the transit of the Dardanelles Strait, in direction from the Mediterranean Sea towards Istanbul / Black Sea.

At 2345, in position Lat. 040° 06.6' N, Long. 026° 21.9' E, passing Cape Kapez, the M.E. - "B&W 5K45 GFC", no. 5 cylinders in line, 4.400 CV at 227 revolutions per minute (r.p.m.) - showed some anomalies in its functioning, the r.p.m. decreased and the load commenced to fluctuate. Finally the main engine stopped (Subject Occurrence).

According to what foreseen by the safety rules concerning the transit in a strait, in the Engine Room (E.R.) there were on duty on watch the Chief Engineer, Mr. Yalcin Acikgöz, the First Engineer, Mr. Ayhan Simsek, and the Second Engineer, Mr. Kemal Cağlar.

The vessel, pushed by the very strong current from the Black Sea to the Mediterranean Sea, about 4 knots of speed, contrary to her navigation, passed the separation line and drifted southwest towards the European coast of the Strait, in the area of Cape Keranfil.

The Master asked the personnel in the E.R. for information. They confirmed that the M.E. had stopped and informed that they were trying to restart it.

Initially the attention of the engine personnel was focused on the pneumatic system, which however resulted in order.

After further ascertainments it was found that the heavy fuel (IFO 180) was polluted with water.

---

[1] Also known as Alexandretta.

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

Subsequently the cause of the existence of water in the heavy fuel was spotted in the breakage of a heating coil of the service tank.

Therefore the engine personnel drained the water from the fuel lines and, subsequently, made other attempts to restart the M.E..

In the meantime the "BERIL 1" came close to the coast at a distance of about 0.25 miles.

The Master was contacted by the local traffic control centre "NARA". They asked for an explanation on the cause of the vessel's drifting. The Master could not hide the circumstance that the M.E. had stopped and the above-mentioned centre immediately sent a tug boat in assistance.

The tug boat "SONDUREN 5" arrived on the spot at 0010 on 03.01.09 and remained in stand-by.

The Master did not accept the assistance of the tug boat, because he hypothesized that the M.E. could be re-started in a short time. He also decided not to drop the anchor because the sea depth in that area is very high and he feared that the vessel's poop could rotate towards the coast, grounding and thus causing damage to the propeller and generally to the propulsion and steering systems.

When, at 0115 of the same day (03.01.09), the M.E. had not yet been restarted, under the continuous pressure of "NARA", a vessel's line was passed to the tug.

The tug gave a violent pull and the rope broke, but, luckily, at about 0125 the M.E. of the "BERIL 1" was re-started.

The Master informed "NARA", that ordered the vessel to reach a safe anchorage area, at the entrance of the Dardanelles Strait, Mediterranean Sea side, called Karanlik Liman, where all the necessary checks were to be carried out, before allowing the resumption of the navigation.

The navigation to the anchorage area was carried out with the assistance of the above-mentioned tug.

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

The "BERIL 1" dropped anchor in the above-mentioned anchorage area, in position Lat. 40° 01.7' N, Long. 026° 18.8' E, at 0250 on 03.01.09. The "SONDUREN 5" was let go.

At about 1300 of the same day the scheduled technical inspection for checks was carried out, which was concluded with satisfactory results. The vessel was thus in the condition to resume navigation, but she was not authorized to leave, since practically "arrested" until the payment of the salvage compensation, claimed by the local traffic control station.

After discussions, on 07.01.09, the Owners agreed the payment of an amount of $ 50.000,00.- (US Dollars fifty thousand)[2], which was immediately effected.

The "BERIL 1" was authorized to sail and heaved anchor, departing, with pilot on board[3], in the evening of the same day, bound for Istanbul.

She reached the anchorage area "KUMKAPI Anchorage area B9" in the morning of 08.01.09, where she dropped anchor, in position Lat. 40° 58.6' N, Long. 028° 56.0' E.

The same day the dismounting of the M.E. for the damage ascertainment commenced. The local workshop " DUHAN MÜHENDISLIK DENICILIK LTD " was instructed, with the co-operation of the engine personnel.

Damage was found to various parts of the main engine, as described with all particulars in the following chapter "DAMAGE AND REPAIRS".

As a consequence of the above described occurrence also the exhaust gas bellow of the main engine broke and part of the exhaust gases entered the E.R..

The E.R. ceiling in the aft part was therefore dirtied and covered with a black and oily layer of exhaust gases.

The renewal of the damaged parts was completed on 22.01.09 and the same day the vessel departed bound for Izmir, for loading a cargo of cement bound for the port of Ashdod (Israel).

---

[2] Allegedly the initial request was of around $ 150.000,00.-
[3] Compulsory after an average during the navigation in the Strait.

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

For further particulars on the occurrence, please refer to documentation, enclosed in photocopy, as listed herebelow and what is set out herein:

- M/V "BERIL 1" - Deck Log Book in English language, 02.01.09, in which we have highlighted in a red box the part connected with subject occurrence; enc. no. 1, no. 2 pages.

- M/V "BERIL 1" - Deck Log Book in English language, 03.01.09, in which we have highlighted in a red box the parts connected with subject occurrence; enc. no. 2, no. 2 pages.

- M/V "BERIL 1" - Engine Log Book in Turkish language, 02.01.09; the relevant translation into English, prepared with the assistance of the Managers, is reported by us; enc. no. 3, no. 2 pages.

- M/V "BERIL 1" - Engine Log Book in Turkish language, 03.01.09; notations on page 2/2 are not connected with subject occurrence; enc. no. 4, no. 2 pages.

- M/V "BERIL 1" – Master's Report, in Turkish language, with attached the translation into English, prepared by the managers; enc. no. 5, no. 2 pages.

- M/V "BERIL 1" – Chief Engineer's Report, in Turkish language, with attached the translation into English, prepared by the Managers; enc. no. 6, no. 2 pages.

- Abstract from the British Admiralty Chart no. 2429 - "CANAKKALE BOGAZI - (THE DARDANELLES)", on which the Master of the "BERIL 1" has indicated the subsequent positions as highlighted with the relevant notes and on which we have indicated the course of the vessel with a red line; enc. no. 7, no. 1 page.

- Abstract from Encarta World Atlas, on which we have highlighted the geographical points of interest; enc. no. 8, no. 1 page.

- M/V "BERIL 1" – IMO CREW LIST, 03.01.09; enc. no. 9, no. 1 page.

- SLOVAK REPUBLIC - "DOCUMENT OF COMPLIANCE" - No. ISM 07.25 - issued on 24.12.07, valid until 01.07.12; enc. no. 10, no. 2 pages.

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)


- SLOVAK REPUBLIC - "SAFETY MANAGEMENT CERTIFICATE" - No. 07.25-02 - M/V " BERIL 1" - issued on 25.12.07, valid until 09.07.12; enc. no. 11, no. 2 pages.

- Owners' Allegation on the cause of damage, 03.01.09; enc. no. 12, no. 1 page.


*


One (1) set of photographs taken by us on 13.01.09 on board the "BERIL 1" when the same was anchored at "KUMKAPI anchorage area", on 23.01.09 at Izmir and at the shop "DUHAN MÜHENDISLIK DENICILIK ltd" on 24.01.09 has already been submitted.


* * *


## D I A R Y
(All times are local times)

| 30.12.08 | 1645 | Iskenderun - Departure, in ballast bound for Kerch. |
| 02.01.09 | 2200 | Dardanelles Strait - Commencement of passage. |
| | 2345 | Ditto - Main engine stopped by itself, in position Lat. 040° 06.6' N, Long. 026° 21.9' E. (Subject Occurrence) |
| 03.01.09 | 0010 | Ditto - M/tug "SONDUREN 5" arrived on the spot. |
| | 0115 | Ditto - Vessel's rope passed to the tug. Rope broken by a strong pull of the tug. |
| | 0125 | Ditto - Main Engine re-started. |
| | 0250 | Ditto - Dropped anchor in the Karanlik Liman anchorage area, in position Lat. 40° 01.7' N, Long. 026° 18.8' E. |
| | 1300 | Ditto - Technical inspection carried out, with satisfactory results. |

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

07.01.09    1925    Ditto - Heaved anchor. Departure towards Istanbul.

08.01.09    1015    Istanbul - Dropped anchor in the "KUMKAPI Anchorage area
                    B9", in position Lat. 40° 58.6' N, Long. 028° 56.0' E.

                    Ditto - Commencement of subject occurrence permanent repairs.

22.01.09    a.m.    Ditto - Completion of subject occurrence permanent repairs.

            p.m     Ditto - Departure, in ballast for Izmir. The vessel resumes her
                    commercial activity.

*

Duration of the subject occurrence permanent repairs carried out at "KUMKAPI
anchorage area" had each group been carried out separately (stay from 08.01.09
to 22.01.09; in rounded running days):

|  | Afloat (days) | Total (days) |
|---|---|---|
| - Subject occurrence permanent repairs ....................... | 15 | 15 |
| - Owner's account work (all deferrable)[1] ..................... | = | = |
| * | | |
| - Total time actual stay ................................................ | 15 | 15 |

Note [1] : Normal maintenance carried out by the crew.

* * *

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

## ASCERTAINMENT OF DAMAGE AND REPAIRS

During our joint attendances on board the "BERIL 1" when the same was anchored at "KUMKAPI Anchorage area", in front of Istanbul (Turkey), on 23.01.09 at Izmir and on 24.01.09 at the shop "DUHAN MÜHENDISLIK DENICILIK LTD", at Tuzla (Istanbul/Turkey) we ascertained, with all interested parties, the damage and/or recommended the repairs necessary for restoring the vessel to her original efficiency.

1st attendance

| | | | |
|---|---|---|---|
| - | Capt. ORHAN BINAY | : | Master, "BERIL 1". |
| - | Mr. YALCIN ACIKGÖZ | : | Chief Engineer, "BERIL 1". |
| - | Mr. AYHAN SIMSEK | : | 1st Engineer, "BERIL 1" |
| - | Mr. KEMAL CAĞLAR | : | 2nd Engineer, "BERIL 1" |
| - | Mr. CELIL ÇALIŞKAN | : | Technical Superintendent of ship's Managers. |
| - | Mr. MASSIMO GRONDA | : | "STUDIO TECNICO NAVALE ANSALDO", Surveyors for ship's H&M Underwriters. |

2nd attendance

| | | | |
|---|---|---|---|
| - | Capt. ORHAN BINAY | : | As above. |
| - | Mr. YALCIN ACIKGÖZ | : | As above. |
| - | Mr. AYHAN SIMSEK | : | As above. |
| - | Mr. KEMAL CAĞLAR | : | As above. |
| - | Mr. CELIL ÇALIŞKAN | : | As above. |
| - | Mr. GIUSEPPE STRAMBI | : | "STUDIO TECNICO NAVALE ANSALDO", as above. |

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| | | |
|---|---|---|
| - Machinery | : | No. 1 Main engine B&W  5K45 GFC, 3,282 kW @ 225 RPM, directly coupled to no. 1 right handed propeller. |
| | | No. 2 diesel generators YANMAR 6MAL-T, 2 x 300 kW, 385 A. |
| | | No. 1 diesel port generator MAN SEG 50 D-32, 264 kW. |
| | | No. 1 OSAKA oil fired boiler, type SSC - 4 - M. |
| - Speed | : | 12 knots |
| - Daily consumption | : | <u>In navigation</u>: |
| | | Heavy fuel (IFO 180): 9.5 t |
| | | <u>At anchor</u>: |
| | | Marine Gasoil (MGO): 0.7 t. |
| - Crew (at time of subject occurrence) | : | No. 19 crew members, including Master. |

* * *

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

## GENERAL CONDITIONS

1. Vessel's conditions

1.1 General

The vessel's maintenance conditions were found satisfactory for her type of commercial traffic and considering her age. We did not ascertain any anomalies worthy of note.

1.2 Main engine

We have examined the SMS documentation concerning the M.E.

In the following table the running hours of the main parts of the M.E. at the end of December 2008 are reported.

In square brackets we have indicated for each item the time interval, in hours, recommended by the Maker between each overhauling [TBO].

| Item / no. / [TBO] | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Cylinder head [4,000] | 3,656 | 443 | 293 | 252 | 220 |
| Exhaust valves [4,000] | 1,571 | 1,571 | 1,571 | 1,571 | 1,571 |
| Inlet valves [1,500] | 269 | 261 | 289 | 261 | 269 |
| Piston [8,000] | 2,260 | 440 | 293 | 252 | 220 |
| Cylinder liner [8,000] | 4,117 | 443 | 292 | 252 | 220 |
| Starting valve [4,000] | 2,260 | 443 | 293 | 252 | 220 |
| Camshaft drive [1,000] | 859 | 859 | 859 | 859 | 859 |
| Camshaft bearings [2,500] | 2,126 | 2,126 | 2,126 | 2,126 | 2,126 |
| Crankshaft bearings [4,000] | 2,126 | 2,126 | 2,126 | 2,126 | 2,126 |
| Tie bolts [3,500] | 3,126 | 3,126 | 3,126 | 3,126 | 3,126 |
| Injection pumps [8,000] | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 |
| Crankpin bearings [1,500] | 1,122 | 1,122 | 1,122 | 1,122 | 1,122 |

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

Common items

| Main starting valve [12,000] | 3,806 |
|---|---|
| Oil and water pressure alarm  [8,000] | 4,011 |
| Lubricating oil filters [1,500] | 1,471 |

All the hours are well within the limits recommended by the Maker before an overhauling.

We have examined the M.E. functioning parameters of the last voyage, which resulted all in the normal range.

The last lube oil analysis of the M.E. was carried out by "BP" in January 2009.

The lube oil charge resulted in order.

The last Deflections of the M.E.  crankshaft were measured in November 2008 and found in order.


2.  Crew
(enc. no. 9)

Nineteen (19) persons, including Master.

  ➢  Master, 2nd Officer, Chief engineer, 1st and 2nd Engineer, bosun, deck boy, no. 1 fitter, no. 1 oiler, cook and steward of Turkish nationality;
  ➢  Chief Officer, no. 2 A/B and no. 2 oilers of Azeri nationality;
  ➢  No. 2 A/B and no. 1 oiler of Georgian nationality.

Crew recruitment is dealt with by Managers.

From what found in documents examined by us, the crew was in accordance with Safe Manning Certificate requirements as regards number and rank and in compliance with STCW regulations.

* * *

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)


CLASS POSITION (at the time of subject occurrence)

-    TURK Loydu

     [+] 1A5 GENERAL CARGO [+] M


A.   From the Survey Status Report, dated 15.12.08

| Certificate | Done | Due |
|---|---|---|
| - Class ........................................................ | 12.07.07 | 23.01.12 |
| - Load Line ................................................. | 12.07.07 | 23.01.12 |
| - Safety Radio ............................................. | 12.07.07 | 23.01.12 |
| - Cargo Ship Safety Equipment ................................. | 12.07.07 | 23.01.12 |
| - Cargo Ship Safety Construction ............................. | 12.07.07 | 23.01.12 |
| - Garbage / Sewage ......................................... | 12.07.07 | 23.01.12 |
| - Solid Bulk Cargo ......................................... | 12.07.07 | 23.01.12 |
| - International Air Pollution Prevention ............... | 12.07.07 | 23.01.12 |
| - International Oil Pollution Prevention ................ | 12.07.07 | 23.01.12 |
| - Cargo Gear ............................................... | 10.07.07 | 09.07.12 |
| - Safety Management (SMC) .................................. | 02.07.07 | 01.07.12 |
| - Ship Security (ISSC) ..................................... | 25.12.07 | 11.07.12 |

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| Survey | Done | Due[5] |
|---|---|---|
| - Special | 14.07.07 | 23.01.12 |
| - Ordinary, Hull | 09.04.08 | 23.04.09 |
| - Drydock | 11.02.07 | 23.01.10 |
| - Tailshaft | 05.07.07 | 23.01.12 |
| - Load Line | 09.04.08 | 23.04.09 |
| - Cargo Ship Safety Equipment | 09.04.08 | 23.04.09 |
| - Cargo Ship Safety Construction | 09.04.08 | 23.04.09 |
| - Garbage / Sewage | 09.04.08 | 23.04.09 |
| - Solid Bulk Cargo | 09.04.08 | 23.04.09 |
| - International Air Pollution Prevention | 09.04.08 | 23.01.09 |
| - International Oil Pollution Prevention | 09.04.08 | 23.04.09 |
| - Cargo Gear | 09.04.08 | 23.04.09 |
| - Safety Management (SMC) (Intermediate) | 10.07.07 | 10.12.09 |
| - Ship Security (ISSC) | 25.12.07 | 12.07.10 |

B.  Continuous survey

Vessel enjoyed Continuous Machinery Survey.

In the Survey Status Report shown to us no Survey items were listed, but no Surveys were reported as due.

---

[5] For each Visit we are giving the last due date of the allowed time window.

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

C.  <u>Class conditions connected with areas affected by the subject occurrence damage</u>

According to documentation examined by us, there were none.

D.  <u>Class conditions not connected with the subject occurrence</u>

According to documentation examined by us, there were none.

E.  <u>Safety Management System (S.M.S.)</u>

Document of Compliance (enc. 10) and Safety Management Certificate (enc. 11) were found on board.

The documents required by SMS were regularly filled in and filed according to the System.

The Designated Person Ashore (DPA) had been duly informed of the subject occurrence.

* * *

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)


## ASSISTANCE RENDERED BY THE TUG


### 1. Foreword

As described in the paragraph "NARRATIVE", the tug "SONDUREN 5" was sent on the spot by the local traffic control station to assist the "BERIL 1".


### 2. Main Characteristics of the tug " SONDUREN 5"

| | | |
|---|---|---|
| - | Name | : | " SONDUREN 5" |
| - | IMO Number | : | 7531723 |
| - | Type | : | Tug |
| - | Flag | : | Turkey |
| - | Classification Society | : | Turk Loydu |
| - | Owner / Manager | : | Turkish Directorate General of Coastal Safety |
| - | Year of build | : | 1982 |
| - | Length, o.a. | : | 36.230 m |
| - | Breadth, extreme | : | 9.300 m |
| - | Draft | : | 3.869 m |
| - | Gross registered tons | : | 295 GRT |
| - | Installed power | : | 1,824 kW |
| - | Bollard Pull | : | 30 t |


### 3. Tug's Services

The "SONDUREN 5" arrived on the spot at about 0010 on 03.01.09 and took the vessel's rope at about 0115.

The rope broke at 0125. No further rope was passed.

The tug was let go at 0250 of the same day (03.01.09).

The total duration of the assistance was two (2) hours and forty (40) minutes.

* * *

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)


## DAMAGE AND REPAIRS

All the repairs recommended below are permanent repairs and they were carried out during the stay at "KARZAL Anchorage area".

| Damage | Repairs |
|---|---|
| **1.  Main Engine** | |
| 1.1  Liners no. 4 and no. 5 scratched and cracked. | Renew no. 2 liners. |
| 1.2  Pistons no. 4 and no. 5 cracked in way of the piston rings grooves. | Renew no. 2 pistons. |
| 1.3  No. 5 fuel oil pumps scratched. | Dismount, clean, overhaul, recondition and re-mount the no. 5 pumps. |
| 1.4  Complete set of the camshaft bearings scratched. | Dismount, clean, overhaul, recondition and re-mount the camshaft. Renew no. 5 camshaft rollers and no. 5 camshaft roller guides. |
| 1.5.  Exhaust gas bellow cracked. | Renew. |
| 1.6  Lube oil charge contaminated by water. | Renew the lube oil charge. |
| **2.  Fuel oil system** | |
| 2.1  No. 1 heating coil in the service tank broken. | Renew the heating coil. Purge all the water from the fuel oil system. |

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

|  Damage | Repairs |

3.  **Heating system**

Polluted by fuel oil.                    Clean the system and the hot well.

4.  **Engine room, ceiling above the M.E., aft part**

Covered with a layer of oily and        Clean, degrease and paint.
black exhaust gases.

5.  **Sundry and incidentals.**

-   Furnish electrical power to the vessel for the repair work.

-   Provide transportation of materials and manpower to the vessel in the roads.

-   Clean and recoat as originally all repaired and disturbed areas.

-   Carry out necessary tests and trials in order to ascertain that the work has been carried out satisfactorily. Rectify all defects found.

-   Carry out the above work to the satisfaction of the representatives of the Classification Society, of the Owner and of the Underwriters.

Notes:  Complete dismounting of the main engine in all its parts is required to carry out damage ascertainment and permanent repairs.

Renew all those parts (gaskets, o-rings, piston rings, other) according to the good practice in similar works.

*

**Temporary repairs**

No temporary repair was carried out.

*

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)


Owner's Account work

During the ship's stay in the roads at Tuzla no Owner's Account work was carried out, except for normal maintenance by the crew.


* * *


C A U S E

The Owner's Allegation on the cause of damage is attached (enc. no. 12).

The Insured states that:

*"Heating coils broken and water penetrate to the service tank then it mixes with water and runs to the fuel pump then engine and engine starts to run unbalanced condition and when crew tried to keep engine running due to narrow channel passing, this condition gives damage to the manifold expansion joints, fuel pumps, liners, pistons and cam shaft bearings due to unbalanced running of the engine".*

The allegation is tenable.

The navigation from the re-starting of the main engine (03.01.09 - 0125 hours) to the first safe anchorage position at the entrance of the Dardanelles Strait and then to the "KUMKAPI Anchorage area B9" did not aggravate the damage. The repairs / renewals carried out would have been the same if carried out immediately after the occurrence, before the above-mentioned navigation.

* * *

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)


## EXAMINATION OF CLAIMS

In making the allocation which follows of the amounts claimed, we have examined the various items of the individual invoices and/or Owner's Debit Notes, analysing the same both in relation to their fairness and also to their connection with the subject occurrence, bearing in mind what we ascertained during our attendances on board and in repair shop.

We have allowed as average the amounts pertaining to work, services and/or expenses considered strictly connected with the occurrence or direct consequence of the same.

We have attributed to Owners' account the expenses considered by us as not consistent because concerning ordinary maintenance and/or not connected.

The allocation of some items, not being of a particularly technical nature and/or possibly subject to special Policy conditions, has been ascribed by us to the competence of the Average Adjuster. For such items, we have not however failed to express our technical opinion and/or our view on their fairness where the case, should this facilitate the task of the Adjuster himself.

The repairs mentioned here below refer to permanent repairs.

Ordinary scrap material remained contractually property of repair shops.

The amounts of the invoices and/or of claim documents are analysed in the currency of origin:

$       = US Dollar
YTL  = New Turkish Lira

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| M/V "BERIL 1" | Claimed [$] | Average [$] | Average Adjuster [$] | Owner's Account [$] |
|---|---|---|---|---|

1. Invoice "SINOPACIFIC", Shanghai (China), no. SPMAR-INV-0010209, dated 10.02.09, $ 219,810.02-.

Supply of spare parts for the main engine, part connected with subject occurrence permanent repairs and part Owner's Account, as detailed hereunder.

Our Note: the amounts indicated in the invoice do not always coincide with the product of the number of supplied parts and the unit price. We have indicated the correct amount, resulting from the multiplication as above.

| | Claimed [$] | Average [$] | Average Adjuster [$] | Owner's Account [$] |
|---|---|---|---|---|
| No. 4 cylinder liners, of which no. 2 Average and no. 2 Owner's Account ....... | 35,006.68.- | 17,503.34.- | = | 17,503.34.- |
| O-rings ................................................. | 292.25.- | 292.25.- | = | = |
| O-rings ................................................. | 267.90.- | 267.90.- | = | = |
| O-rings ................................................. | 297.10.- | 297.10.- | = | = |
| No. 10 tightening rings ............................ | 5,903.40.- | 5,903.40.- | = | = |
| No. 15 scraper rings (lower) .................... | 3,653.10.- | 3,653.10.- | = | = |
| No. 5 scraper rings.................................. | 1,948.30.- | 1,948.30.- | = | = |
| No. 5 piston crowns, of which no. 2 Average and no. 3 Owner's Account ....... | 48,864.50.- | 19,545.80.- | = | 29,318.70.- |
| Bolts ..................................................... | 87.65.- | 87.65.- | = | = |
| No. 15 piston rings ................................. | 613.65.- | 613.65.- | = | = |
| No. 10 piston rings ................................. | 409.10.- | 409.10.- | = | = |
| No. 5 cylinder assembly .......................... | 14,612.35.- | 14,612.35.- | = | = |
| No. 5 suction valve assembly ................... | 4,958.45.- | 4,958.45.- | = | = |
| No. 5 camshaft roller guides .................... | 17,500.00.- | 17,500.00.- | = | = |
| No. 5 camshaft rollers ............................. | 4,602.90.- | 4,602.90.- | = | = |
| No. 5 pins .............................................. | 2,566.90.- | 2,566.90.- | = | = |
| No. 10 disks ........................................... | 146.10.- | 146.10.- | = | = |
| No. 5 bushes .......................................... | 2,566.90.- | 2,566.90.- | = | = |
| No. 5 thrust pieces ................................. | 160.75.- | 160.75.- | = | = |

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| M/V "BERIL 1" | Claimed [$] | Average [$] | Average Adjuster [$] | Owner's Account [$] |
|---|---|---|---|---|
| No. 5 exhaust valve seats | 7,340.00.- | 7,340.00.- | = | = |
| No. 5 exhaust valve spindles | 18,752.55.- | 18,752.55.- | = | = |
| No. 5 spindle guides | 1,495.35.- | 1,495.35.- | = | = |
| No. 5 liners, of which no. 2 Average and no. 3 Owner's Account | 1,082.25.- | 409.14.- | = | 613.71.- |
| No. 20 piston rings, spares for Owner's Account | 292.20.- | = | = | 292.20.- |
| O-rings | 29.20.- | 29.20.- | = | = |
| No. 5 pistons, spares for Owner's Account | 1,217.70.- | = | = | 1,217.70.- |
| No. 20 piston rings, spares for Owner's Account | 292.25.- | = | = | 292.25.- |
| No. 5 Deareation valves | 1,256.65.- | 1,256.65.- | = | = |
| Pipes | 1,169.10.- | 1,169.10.- | = | = |
| Oil seals | 77.90.- | 77.90.- | = | = |
| Stay bolts | 1,656.00.- | 1,656.00.- | = | = |
| Spindle guide assemblies | 4,870.00.- | 4,870.00.- | = | = |
| Thrust spindle assemblies | 1,461.20.- | 1,461.20.- | = | = |
| Atomizers | 1,461.20.- | 1,461.20.- | = | = |
| FV holder assemblies | 3,896.60.- | 3,896.60.- | = | = |
| O- rings | 58.40.- | 58.40.- | = | = |
| O- rings | 78.00.- | 78.00.- | = | = |
| Sealing rings | 97.40.- | 97.40.- | = | = |
| Starting valve housings | 4,442.16.- | 4,442.16.- | = | = |
| Spindles | 1,266.40.- | 1,266.40.- | = | = |
| No. 5 pistons, spares for Owner's Account | 2,750.00.- | = | = | 2,750.00.- |
| No. 5 liners, spares for Owner's Account | 462.70.- | = | = | 462.70.- |
| Distance pieces | 170.50.- | 170.50.- | = | = |
| O-rings | 29.20.- | 29.20.- | = | = |
| Packing and delivery | 3,591.32.- | = | 3,591.32.- | = |
| Insurance | 2,114.08.- | = | 2,114.08.- | = |
| Air freight to Istanbul | 14,000.00.- | = | 14,000.00.- | = |
| Total claim no. 1 | 219,809.64.- | 147,653.69.- | 19,705.40.- | 52,450.55.- |

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| M/V "BERIL 1" | Claimed [$] | Average [$] | Average Adjuster [$] | Owner's Account [$] |
|---|---|---|---|---|
| 2. Invoice "DUHAN MÜHENDISLIK", Tuzla, no. 006289, dated 24.01.09, $ 88,290.00-. | | | | |

The invoice is handwritten, in Turkish language.

Translation into English, prepared by the Insured, is attached.

| | Claimed | Average | Average Adjuster | Owner's Account |
|---|---|---|---|---|
| Dismantling, overhauling, cleaning and re-mounting on board of the various parts of the main engine, connected with subject occurrence permanent repairs ......................... | 88,290.00.- | 88,290.00.- | = | = |

**3. Invoice "DUHAN MÜHENDISLIK", Tuzla, no. 006287, dated 20.01.09, $ 36,440.00-.**

The invoice is handwritten, in Turkish language.

Translation into English, prepared by the Insured, is attached.

| | Claimed | Average | Average Adjuster | Owner's Account |
|---|---|---|---|---|
| Dismantling, overhauling, cleaning, reconditioning and re-mounting on board of the no. 5 fuel pumps of the main engine, connected with subject occurrence permanent repairs ............................................... | 36,440.00.- | 36,440.00.- | = | = |

Our Note: the invoice erroneously indicates that the repairs were carried out to no. 6 fuel pumps.

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| M/V "BERIL 1" | Claimed [$] | Average [$] | Average Adjuster [$] | Owner's Account [$] |
|---|---|---|---|---|
| 4. Invoice "DUHAN MÜHENDISLIK", Tuzla, no. 006288, dated 20.01.09, $ 26,810.00-. | | | | |
| The invoice is handwritten, in Turkish language. | | | | |
| Translation into English, prepared by the Insured, is attached. | | | | |
| Dismantling, overhauling, cleaning, reconditioning and re-mounting on board of the camshaft of the main engine, connected with subject occurrence permanent repairs ... | 26,810.00.- | 26,810.00.- | = | = |
| 5. Invoice "GÖK DENIZ", Pendik (Istanbul / Turkey), no. 255157, dated 16.01.09, $ 3,800.00-. | | | | |
| The invoice is handwritten, in Turkish language. | | | | |
| Translation into English, prepared by the Insured, is attached. | | | | |
| Renewal of exhaust gas bellow ........................ | 3,500.00.- | 3,500.00.- | = | = |
| 6. Invoice "EGELI DENIZCILIK", Tuzla, no. 042709, dated 19.02.09, $ 4,700.00-. | | | | |
| The invoice is handwritten, in Turkish language. | | | | |
| Translation into English, prepared by the Insured, is attached. | | | | |

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| M/V "BERIL 1" | Claimed [$] | Average [$] | Average Adjuster [$] | Owner's Account [$] |
|---|---|---|---|---|
| Cleaning of service tank and of the steam circuit. Painting of engine room ...................... | 4,700.00.- | 4,700.00.- | = | = |

7. Invoice "JUPITER SHIPPING AND TRADING Ltd.", Charleston (USA), no. 02009-1535, dated 19.01.09, $ 19,820.00-.

| | | | | |
|---|---|---|---|---|
| Supply of new main engine lube oil charge ... | 19,820.00.- | 19,820.00.- | = | = |

8. Invoice "ISTANBUL 34", Karaköy (Istanbul / Turkey), no. 220109/125/oma, dated 22.01.09, $ 36,100.00-.

The invoice is in Turkish language.

Translation into English, prepared by the Insured, is attached.

Agency service and expenses, detailed as follows.

No voucher attached.

| | | | | |
|---|---|---|---|---|
| Departure formalities from the Dardanelles after subject occurrence ...................... | 5,800.00.- | = | 5,800.00.- | = |
| Departure formalities from Istanbul after subject occurrence permanent repairs and anchorage dues ...................... | 2,610.00.- | = | 2,610.00.- | = |
| Transit fine, as a consequence of subject occurrence ...................... | 10,690.00.- | = | 10,690.00.- | = |
| Motor boat / launch expenses (50% connected with subject occurrence, our estimate) ...................... | 15,000.00.- | = | 15,000.00.- | = |
| Agency fees ...................... | 2,000.00.- | = | 2,000.00.- | = |
| Total claim no. 8 ...................... | 36,100.00.- | = | 36,100.00.- | = |

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| M/V "BERIL 1" | Claimed [$] | Average [$] | Average Adjuster [$] | Owner's Account [$] |
|---|---|---|---|---|

9.    Managers' Debit Note, no number, dated 23.02.09, $
17,094.23-.

Bunker consumption as described
herebelow.

Attached invoices confirming the claimed
unit prices.

| | | | | |
|---|---|---|---|---|
| ▪  IFO 180 consumption for the deviation Dardanelles - Istanbul and back, 1.24 days steaming @ 10 t / day @ 279.73.- / t . | 3,394.00.- | = | 3,394.00.- | = |

Our Note: at the time of subject occurrence
the vessel was indeed steaming towards
Istanbul, in navigation from Iskenderun to
Kerch.

Daily consumption, steaming, stated to us by
the Chief Engineer: 9.5 t.

Claimed unit price fair and reasonable.

| | | | | |
|---|---|---|---|---|
| ▪  Marine Gasoil consumption for the production of electrical power during the vessel's stay at anchor at Istanbul, to carry out subject occurrence permanent repairs, 1 t /day x 20 days @ 685.00.- $ / t | 13,699.98.- | = | 13,699.98.- | = |

Our Note: 75% connected with subject
occurrence permanent repairs. The rest for
normal life on board.

Daily consumption, steaming, stated to us by
the Chief Engineer: 0.7 t.

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| M/V "BERIL 1" | Claimed [$] | Average [$] | Average Adjuster [$] | Owner's Account [$] |
|---|---|---|---|---|
| The total stay to carry out permanent repairs was 15 days: | | | | |
| 15 days x 0.7 t/day x 685 $ / t = $ 7,192.50.- | | | | |
| Claimed unit price fair and reasonable. | | | | |
| Total claim no. 9 ................................................. | 17,094.23.- | = | 17,094.23.- | = |

10.  Managers' Debit Note, no number, dated 23.02.09, $ 3,840.00-.

Lube oil consumption for deviation Dardanelles - Istanbul and return and during the stay at anchor at Istanbul, to carry out subject occurrence permanent repairs, 60 l /day x 20 days @ 3.20.- $ / l

| | Claimed [$] | Average [$] | Average Adjuster [$] | Owner's Account [$] |
|---|---|---|---|---|
| | 3,840.00.- | = | 3,840.00.- | = |

Our Note: 75% connected with subject occurrence permanent repairs. The rest for normal life on board.

The total stay to carry out permanent repairs was 15 days:

15 days x 60 l/day x 3.2 $ / l = $ 2,880.00.-

Claimed unit price fair and reasonable.

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| M/V "BERIL 1" | Claimed [$] | Average [$] | Average Adjuster [$] | Owner's Account [$] |
|---|---|---|---|---|
| 11. Managers' Debit Note, no number, no date, $ 5,000.00.- | | | | |
| Bonus paid to the crew for assistance during permanent repairs, as per receipt signed by crew members ..................................................... | 5,000.00.- | = | 5,000.00.- | = |
| If carried out by shore personnel the cost would have been higher. | | | | |
| 12. Managers' Debit Note, no number, 23.02.09, $ 19,000.00-. | | | | |
| Fees and expenses for the attendance of Managers' Superintendent, for no. 20 days @ 800 €/day (fees) plus 150 € / day (expenses) ... | 19,000.00.- | = | 19,000.00.- | = |
| Our Note: The total stay to carry out permanent repairs was 15 days. | | | | |
| The attendance of Managers' Superintendent was beneficial for the ascertainment of the damage and for organising and supervising the relevant permanent repairs. | | | | |
| 13. Managers' Debit Note, no number, 23.02.09, $ 10,000.00-. | | | | |
| Office expenses for communication, copies, assistance to Hull & Machinery Surveyor, other ............................................................... | 10,000.00.- | = | 10,000.00.- | = |
| 14. Meeting minutes, no number, 07.01.09, $ 50,000.00-. | | | | |
| The minutes are in Turkish language. | | | | |

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| M/V "BERIL 1" | Claimed [$] | Average [$] | Average Adjuster [$] | Owner's Account [$] |
|---|---|---|---|---|
| Translation into English, prepared by the Insured, is attached. | | | | |
| Salvage compensation ....................................... | 50,000.00.- | = | 50,000.00.- | = |
| It confirms that the original request for salvage compensation was  $ 150.000,00.-. | | | | |
| Subsequently particular payment agreements were reached and the amount was reduced to  $ 50.000,00.- | | | | |
| Total $ ............................................................. | 540,703.87.- | 327,513.69.- | 160,739.63.- | 52,450.55.- |

* * *

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| M/V "BERIL 1" | Claimed [YTL] | Average [YTL] | Average Adjuster [YTL] | Owner's Account [YTL] |
|---|---|---|---|---|
| **15.** Invoice "TÜRK LOYDU", Tuzla, no. 920065, dated 12.01.09, YTL 2,650.00.-. | | | | |
| Connected with SMS audit and not with subject occurrence ............................................. | 2,650.00.- | = | = | 2,650.00.- |
| **16.** Invoice "TÜRK LOYDU", Tuzla, no. 920064, dated 12.01.09, YTL 1,055.00.-. | | | | |
| The invoice is in Turkish language. | | | | |
| Translation into English, prepared by the Insured, is attached. | | | | |
| Fees and expenses for surveys connected with subject occurrence ...................................... | 1,055.00.- | 1,055.00.- | = | = |
| **17.** Receipt "PILOTAGE TUGBOAT MOORINBOT", Istanbul, no. 815225, dated 22.01.09, YTL 730.46.-. | | | | |
| Pilot service ............................................................ | 730.46.- | = | 730.46.- | = |
| Compulsory service after subject occurrence, as described in the chapter "NARRATIVE". | | | | |
| **18.** Invoice "KIYI EMNIYETI", Istanbul, no. 346066, dated 16.01.09, YTL 1,836.82.-. | | | | |
| The invoice is in Turkish language. | | | | |
| Translation into English, prepared by the Insured, is attached. | | | | |

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm - "BERIL 1" - cont.)

| M/V "BERIL 1" | Claimed [YTL] | Average [YTL] | Average Adjuster [YTL] | Owner's Account [YTL] |
|---|---|---|---|---|
| Light dues for entering Marmara Sea and exit from the Dardanelles on 15.12.08 (not connected) ............................................... | 1,836.82.- | = | 1,836.82.- | = |

19. Invoice "KIYI EMNIYETI", Istanbul, no. 348182, dated 29.01.09, YTL 670.59. -.

The invoice is in Turkish language.

Translation into English, prepared by the Insured, is attached.

| | | | | |
|---|---|---|---|---|
| Light dues for entering the Dardanelles on 02.01.09 ............................................... | 670.59.- | = | 670.59.- | = |

Our Note: in the intended navigation from Iskunderian to Kerch the vessel should have paid the same amounts.

20. Invoice "TÜRKIYE DENIZCILIK ISLETMELERI", Istanbul, no. 00040 - 00198, dated 15.01.09, YTL 992.72. -.

The invoice is in Turkish language.

Translation into English, prepared by the Insured, is attached.

| | | | | |
|---|---|---|---|---|
| Anchorage dues in the Dardanelles, from 07.01.09 after subject occurrence ..................... | 992.72.- | = | 992.72.- | = |
| **Total YTL** ............................................... | 7,935.59.- | 1,055.00.- | 4,230.59.- | 2.650.00.- |

* * *

STUDIO TECNICO NAVALE ANSALDO

(No. 09/4595/MG/dm – "BERIL 1" – cont.)

### C O N C L U S I O N

The occurrence of 02.01.09 relative to the M/V "BERIL 1" caused damages, the permanent repair of which gave rise to claims for a total of:

$$\begin{array}{ll} \$ & 540,703.87.- \\ YTL & 7,935.59.- \end{array}$$

Damages are allowed for the amounts of:

$$\begin{array}{ll} \$ & 327,513.69.- \\ YTL & 1,055.00.- \end{array}$$

Save the amounts allocated to the competence of the Average Adjuster ( $ 160,739.63.-, YTL 4,230.59.-).

\* \* \*

The above report is issued without prejudice for cause and liability and subject to terms and conditions of Insurance Policies.

STUDIO TECNICO NAVALE ANSALDO

(Massimo Gronda)

Genoa, 20 April 2009

Enc.: no. 12 (twelve) as per list at pages 5 and 6.

- 32 -

*M/v . "BERIL 1"*

APPROVATO DAL COLLEGIO
CONTROLLO LIQUIDAZIONI
GENOVA il 16/05/2009
N. Autorizz. 3742

ADJUSTMENT OF CLAIM

for

PARTICULAR AVERAGE

per

M/v. "BERIL 1"

2nd January 2009 – Main Engine damage

\*\*\*\*\*\*\*\*

INSURANCE POLICY

*20% of risk*

By cover note no. 061/2008  issued in Genoa on 26th February 2008, Messrs. Lloyd Italico-Divisione Toro Assicurazioni insured in favour of Messrs. EMRE GEMICILK DENIZCILIK TIC. LTD. STI. (as Managers) and/or SUMMIT NAVIGATION LTD (as Owners), the sum of US$ 900.000 on Hull and Machinery of the M/v. "BERIL 1" (valued at US$ 4.500.000), Slovakia flag, for 12 months from 00.00 hours on 23rd February 2008.

1

The insurance was granted as per Institute Time Clauses Hull (1.11.95) with collision liability excluded in full.

The particular conditions included also a Small G.A. Clause in the amount of US$ 100.000

The deductible was agreed in US$ 75.000 all claims, each accident excluding Total Loss and Constructive Total Loss.

The insurance was granted for navigation in Med Sea, Black Sea, Continent Port (including UK), West Coasts of Africa, Red Sea and Gulf of Aden, or held covered.

The Assured committed the management of the policy to Messrs. Sipex Insurance & Reinsurance Brokers of Manno (Switzerland).

*Adjusters' Note – We have been informed that the remaining 80% of the risk was placed, always through Messrs. Sipex at the same terms and conditions of the policy shown above as follows:*

*HEMISPHERE* ................................................................................................................*40%*
*MILITARY* ......................................................................................................................*25%*
*INDIA INTERNATIONAL INSURANCE* ........................................................................*10%*
*INTERNATIONAL GIORDAN INSURANCE* ..................................................................*5%*

2

# SUMMARY OF FACTS

On 30 December 2008, the "BERIL 1" left the port of Iskenderun (Turkey) bound for Kerch (Ukraine) , in ballast.

In the night of 21st January 2009 the vessel commenced the transit of the Dardanelles Strait.

At 23.45, whilst in position Lat. 040° 06.6' N, Long. 026° 21.9' E, the r.p.m. of the main engine started decreasing and the load commenced to fluctuate. After that the main engine suddenly stopped. As a consequence of the above described occurrence, also part of the exhaust gases entered the engine room which was covered with a black and oily layer.

The vessel, pushed by the very strong current contrary to her navigation, passed the separation line and drifted southwest towards the European coast of the Strait, in the area of Cape Keranfil.

Upon request of the Master, the engine personnel informed that they had found heavy fuel (IFO 180) polluted with water and that, before trying to restart the engine, they had to drain the water from the fuel lines.

In the meantime the "BERIL 1" came close to the coast at a distance of about 0.25 miles.

The Master was contacted by the local traffic control centre which, in the light of the explanation received in respect of the engine damage, arranged for a tug boat to be immediately sent in assistance.

The tug boat "SONDUREN 5" arrived on the spot at 0010 on the 3rd January but the Master refused the assistance being convinced that the Main Engine could be re-started soon. The tug remained therefore in stand-by.

As a matter of fact, at 0115 of the same day (03.01.09), the Main Engine had not yet been restarted and, therefore the Master – who could not drop the anchor because of the sea depth in that area - decided to pass a line to the tug.

Due to a violent pull, said rope broke but, at about 0125 hours, the Main Engine of the "BERIL 1" could be luckily restarted and the ship - with the assistance of the above-mentioned tug - reached a safe anchorage area (named *"Keranlink Liman"*) , at the entrance of the Dardanelles Strait, where all the necessary inspections were arranged before resuming the intended voyage.

At 02.50 hours on 3rd January 2009 the "BERIL 1" dropped anchor in position Lat. 40° 01.7' N, Long. 026° 18.8' E, and the "SONDUREN 5" was dismissed.

At about 13.00 of the same day preliminary inspections were carried out in consequence thereof the vessel was authorized to be removed to Istanbul (closest port capable to offer shipyard hand-labour) in order to carry out the necessary repairs. The authorization was however conditioned by the payment of the tug remuneration which had been in the meantime claimed by the local traffic control station in the amount of US$ 150.000.

On 7th January 2009 the Owners and the tug Owners reached an agreement for a prompt settlement in the reduced amount of US$ 50.000,00.- which was immediately paid by the Shipowners.

On the same evening, the m/v "BERIL 1" could eventually depart from the anchorage area bound for Istanbul. In the meantime, considering the estimated time to be spent at Istanbul for completing the repairs (15/20 days) the original voyage to Ukraine was cancelled by the Charterers.

Upon vessel's arrival in Piraeus, more accurate inspections of the damage suffered by the main engine were disposed, revealing presence of damage to various components.

The renewal of the damaged parts was completed on 22nd January 2009 and, on the same day, the vessel departed bound for Izmir, for loading a cargo of cement bound for the port of Ashdod (Israel).

## PER MASTER CASUALTY REPORT DATED 3rd JANUARY 2009

*I, the master of m/v. "BERIL 1", entered Dardanelle Straits on 2nd Jan 2009 at 22.15 Lmt. When we were passing through Kepez Noise at 23.45 our vessel's speed started to down due to M/E stoppage. I informed Vts control Nara. M/E cloud not be started within a short time despite several trials. Due to current my vessel stared to drift and passed the other side of the separation (north bound) and vessels bow turned the south bound side. We drifted through the Karanfil Noise to southwest. I could not dropped the anchor due to vessels speed, strong current, depth of the sea, risk of cables laid under water and surface of the bottom. The DPA, Mr Ersen Topcu, was immediately informed, and also during all we had a phone contact the technical manager Mr Cecil Caliskan and upon getting close the shore when depth is suitable for anchoring we also considered the risk that in case the anchor stops the vessel there was a risk of turning her bow the current northeast side and aft would turn to the shore side and there was a big risk of touching the rudder and propeller to the rocks which would be resulted excessive damage on the vessel. Then I decided to give the rope from aft side to the tug waiting for nearby and towage started our M/E started and rope cut. Then we made a stern maneuvering and rescued our vessel from the shore.*

*After we got instructions from Vts Kumkale to drop anchor at Karanlik Limann anchorage and we dropped the anchor to the position of 4001 01,7 n-026 18,8 on 3rd Jan 2009 at 02.50 hrs Lmt.*

*Orhan Binay*

*Master of "BERIL 1"*

PER CHIEF ENGINEER REPORT DATED 8th JANUARY 2009

*While the vessel was passing through Kepez. Noise the main engine started to work in an abnormal way. The revolutions of main engine started to decrease while the load started the fluctuate.*

*Then the main engine stopped and we tried to restart it unsuccessfully three times. We check immediately the pneumatic system which was found in order. Then we started checking the fuel system and we found water on the fuel lines. We tried to drain the water from all the cylinders with the main engine on the turning gear, we changed the fuel valves on cylinders n. 4 and n. 5 and then, as soon as possible we restarted the main engine because the vessel was drifting in a very dangerous area.*

*With the main engine still running unbalanced there was also an explosion inside the exhaust gas manifold breaking one of the expansion joints, we reached the safe anchorage area where, under the assistance of a local workshop we started making the necessary repairs.*

*The fuel service tank was emptied and its inspection revealed that the heating coil was broken.*

*The cylinders n. 4 and n. 5 were overhauled and inspected. Both liners and pistons were found scratched, some piston rings broken. All fuel pumps were opened-up and found scratched. One of the exhaust gas bellow was found broken. We inspected the camshaft and we found all bearings also scratched while the cams were found in satisfactory conditions.*

*The necessary spare parts were supplied by the workshop in renewing the liners, the piston heads, the fuel pumps and the camshaft bearings.*

*We also called a specialized Company to lean the service tank and to make the repair of the broken heating coil. The sludge removal from the service tank was taken by the cleaning Company that also arranged its disposal.*

6

# TECHNICAL SURVEYS

The task of making the necessary inspections on board of the vessel in order to ascertain cause and nature of the damage suffered by the vessel as a consequence of the casualty, was entrusted by the Hull & Machinery Underwriters to Messrs. Studio Tecnico Navale Ansaldo.

The above Surveyors, after attending on board on 23rd and 24th January 2009 and upon completing all the appropriate enquiries and collecting the necessary documentation, issued on Genoa, 20th April 2009 their final Survey Report.

Said document, which consists of 32 pages (excluding any appendix) is entirely reproduced, for the sake of completeness, as an annex to the present Adjustment and has to be considered as fully incorporated herein.

Wherever reference is made, in the following sections of this document, to some specific part of the above final Survey Report, the original page number of the Report itself is mentioned so to facilitate the Reader.

ADJUSTERS' EXPLANATORY NOTES

1.  The diary of the vessel is as follows:

| | | |
|---|---|---|
| 30.12.08 | 16.45 | Iskenderun - Departure, in ballast bound for Kerch. |
| 02.01.09 | 22.00 | Dardanelles Strait - Commencement of passage. |
| | 23.45 | Main engine stopped, in position Lat. 040° 06.6' N, Long. 026° 21.9' E. |
| 03.01.09 | 00.10 | M/tug "SONDUREN 5 " arrived on the spot. |
| | 01.15 | Vessel's rope passed to the tug. Rope broken. No other rope passed |
| | 01.25 | Main Engine re-started. |
| | 02.50 | Dropped anchor in the Karanlik Liman anchorage area. |
| | 13.00 | Technical inspection carried out. Vessel authorized to depart towards Istanbul. Voyage to Ukraine cancelled. |
| 07.01.09 | 19.25 | Heaved anchor. Vessel departed towards Istanbul. |
| 08.01.09 | 10.15 | Dropped anchor in the Istanbul anchorage area and commencement of permanent repairs. |
| 22.01.09 | a.m. | Permanent repairs completed. |
| | p.m | Departure, in ballast for Izmir. The vessel resumes her commercial activity. |

2.  According to the allegation put forward by the shipowners' technical office, the cause of the damage suffered by the main engine of the m/v "BERIL 1" may be ascribed to the breakage of an heating coil which allowed the water to enter into the service tank. This gave rise to a contamination of fuel causing the engine to run in unbalanced conditions.

According to the above allegation, when the crew had to keep the engine at sufficient r.p.m. in order to transit the narrow channel of the Dardanelles , this pre-existing situation of unbalanced running created damage to the manifold expansion joints, to the fuel pumps, liners, pistons and camshaft bearings.

8

Upon specific request of the undersigned, Messrs. Studio Ansaldo have pointed out, by e-mail dated 30th April 2009

a) That the engine crew - by the usual checkings made through the hot well window - could have realized quite easily that a fuel contamination had occurred. In fact in the same way the steam spreading out from the broken heating coil had contaminating the fuel circuit, the fuel entering through the same breakage polluted the steam system (and therefore also the hot well.). This would have suggested to exclude the damaged heating coil and to limit the r.p.m. of the engine thus avoiding all the damages subsequently occurred

b) That the cost incurred for the renewal of the damaged heating coil may be estimated at approximately US$ 500. This latter amount will be duly excluded in the calculation which follows.

The damage is therefore the consequence of a crew negligence i.e. of a peril enumerated under cl. 6.2.3 of the I.T.C. –Hulls (ed. 1.10.83). The relevant claim will be therefore settled by the Underwriters previous application of the policy deductible of US$ 75.000.

3. As stated above, following to the assistance rendered by their m/t SONDUREN 5 in favour of m/v BERIL 1, Messrs. Turkish Coastal Safety and Salvage Co. conditioned the departure of the vessel towards the port of Istanbul to the immediate settlement of a salvage remuneration which was indicated – through a letter dated 6th December 2008 - in the amount of US$ 150.000 (in the form of a bank guarantee or cash)

Following to such a request, negotiations started between Tug Company and Shipowners which eventually could reach an agreement on the figure of US$ 50.000 in full and final settlement of the salvage claim. In respect of such agreement a joint *"protocol"* was prepared and signed by all the involved Parties. Original of this document *(and relevant translation into English)* has been passed on to the undersigned for perusal and approval.

We have discussed the matter with the Hull Underwriters Surveyors and have reached the conclusion that,  having in mind the time of effective employment of the tug and the nature of the service rendered,  the amount settled may be considered fair and reasonable.

This amount will be therefore charged to the Hull Underwriters as shown at claim 14 of the *"Disbursements Chapter"* which follows.

*** *** ***

10

DISBURSEMENTS

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | US$ | US$ |

CLAIMS IN US$

## 1. SINOPACIFIC – SHANGAI (CHINA)

Inv. no. 0010209 dated 10.2.2009

supply of spare parts:

| | | | |
|---|---|---|---|
| no. 4 cylinder liners ........................................... | US$ | 35.006,68 | |
| no. 5 piston crowns ........................................... | " | 48.864,50 | |

various components used during the repairs
(O-rings, cylinder assembly, camshaft rollers,
pins, disks, bushes, spindle guides, pistons,
pipes, oil seals, atomizers, sealing rings, liners,
distance pieces, stay bolts etc.)
Including packing, insurance and air freight to

| | | | | |
|---|---|---|---|---|
| Istanbul ........................................................ | " | 135.938,84 | | |
| | US$ | 219.810,02 | 57.652,61 | 162.157,41 |

*Adjusters' Note – As pointed out by the H & M Surveyor, some of
the spare parts supplied by Sinopacific were used for works on
Owners' account. The relevant amounts are well evidenced in
their Survey Report. The apportionment is made accordingly.*

| | | |
|---|---|---|
| carried forward | 57.652,61 | 162.157,41 |

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | US$ | US$ |
| brought forward | 57.652,61 | 162.157,41 |

*The amount allocated into remainder is inclusive of US$ 500 corresponding to cost incurred for the renewal of the damaged heating coil.*

**2. DUHAN MUHENDISLIK - TUZLA**

Invoice no. 6289 dated 24.1.2009

for dismantling, overhauling, cleaning and remounting on board of the various parts of the M.E. ........................ US$  88.290,00                   88.290,00

*Adjusters' Note – The present claim and the following ones up to no. 7 included, refer to the supply of various spare parts used in connection of the repairs (exhaust gas bellow etc.) and/or to the cost of handlabour employed for dismantling, cleaning, re-mounting etc. the Main Engine.*
*The relevant amounts are charged to the underwriters in accordance with the Hull Underwriter Surveyor's advices.*

**3. D I T T O**

Inv. no. 6287 dd. 20.01.2009

dismantling, overhauling, cleaning, reconditioning and re-mounting on board of the no. 5 fuel pumps of M.E. ........................
................................................................... US$  36.440,00                   36.440,00

| | | |
|---|---|---|
| carried forward | 57.652,61 | 286.887,41 |

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | US$ | US$ |
| brought forward | 57.652,61 | 286.887,41 |

*Adjusters' Note – See claim no. 2 above.*


**4. D I T T O**

Invoice no. 6288 dated 20.1.2009

dismantling, overhauling, cleaning, reconditioning and re-mounting on board of the camshaft of the M.E. ...........................

............................................................. US$  26.810,00                    26.810,00


*Adjusters' Note – See claim no. 2 above.*


**5. GOK DENIZ – PENDIK (ISTANBUL)**

Invoice no. 255157 dated 16.1.2009

renewal of exhaust gas bellow ......................... US$  3.500,00                   3.500,00


*Adjusters' Note – See claim no. 2 above.*


**6. EGELI DENIZALIK – TUZLA**

Invoice no. 42709 dated 19.2.2009

clearing of service tank and of the steam circuit ...........................

............................................................. US$  4.700,00                   4.700,00

| | | |
|---|---|---|
| carried forward | 57.652,61 | 321.897,41 |

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | US$ | US$ |
| brought forward | 57.652,61 | 321.897,41 |

*Adjusters' Note – See claim no. 2 above.*

### 7. JUPITER SHIPPING AND TRADING LTD. – CHARLESTON (USA)

Invoice no. 2009 – 1535 dd. 19.01.2009 for supply of new M.E. lube oil charge ................................................... US$   19.820,00          19.820,00

*Adjusters' Note – See claim no. 2 above. The Surveyor, upon request of the undersigned, has approved the claim for prices and quantities.*

### 8. ISTANBUL 34 – KARAKOY (ISTANBUL)

Invoice no. 220109/oma dated 22.01.2009
agency service/expenses as follows:

| | | Remainder | Particular Average |
|---|---|---|---|
| - departure formalities from the Dardanelles (after casualty).................................................. | US$ 5.800,00 | | 5.800,00 |
| - departure formalities form Istanbul including anchorage dues ............................................... | " 2.610,00 | | 2.610,00 |
| - transit fine ...................................................... | " 10.690,00 | 10.690,00 | |
| - motor boat/launch expenses ........................... | " 15.000,00 | 7.500,00 | 7.500,00 |
| - agency fees ...................................................... | " 2.000,00 | | 2.000,00 |
| | US$ 36.100,00 | | |

carried forward                                                        75.842,61          359.627,41

14

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | US$ | US$ |
| brought forward | 79.267,60 | 373.296,65 |

*Adjusters' Note --   As a consequence of the casualty (which occurred at the entrance of the Dardanelles), the intended voyage to Ukraine was cancelled and the ship was removed to Istanbul (closest port which could offer sufficient shipyard hand labour) with the sole purpose of carrying out the particular average damage repairs.*

*The bunker consumptions for the removal to Istanbul (and return to the original position) are therefore charged to the Underwriters as part of the cost of the repairs.*

*The Surveyor has, in this respect, confirmed that the claim is reasonable both for prices and quantities.*

*Item 2 (consumption at Istanbul), is allowed for the sole minor proportion of 75% (suggested by the Surveyors) referring to the production of electric power strictly connected with the damage repairs.*

**10. D E T T O**

L.O. consumptions for deviation Dardanelles/Istanbul and return and during the stay at anchor at Istanbul

| 60 lt./day x 20 dd. at 3,20 $/lt. .......................... US$    3.840,00 | 720,00 | 3.120,00 |
|---|---|---|

*Adjusters' Note  --   Claim apportioned with the same consideration as per previous note.*

| carried forward | 79.987,60 | 376.416,65 |
|---|---|---|

16

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | US$ | US$ |
| brought forward | 79.987,60 | 376.416,65 |

## 11. D I T T O

Bonus paid to the crew for assistance during permanent repairs

| | | |
|---|---|---|
| Chief Engineer ................................................ | US$ | 1.500,00 |
| II Engineer ...................................................... | " | 750,00 |
| III Engineer ..................................................... | " | 750,00 |
| Fitter .............................................................. | " | 500,00 |
| Oiler.............................................................. | " | 500,00 |
| Oiler .............................................................. | " | 500,00 |
| Fitter .............................................................. | " | 500,00 |
| | US$ | 5.000,00 |

5.000,00

*Adjusters' Note – The Surveyor has confirmed that the above crew members effectively gave their assistance in the particular average damage repairs, pointing out that, had the same jobs been entrusted to local shore labour, the relevant cost would have resulted considerably higher. With such remarks the claim, duly supported by evidences, is charged in full to the underwriters being part of the reasonable cost of the repairs.*

## 12. D I T T O

Fee/expenses of the technical Superintendent attending for no. 20 days at 800 US$/day plus US$ 150/day expenses ...........................
.................................................................... US$  19.000,00

| | | |
|---|---|---|
| | 7.750,00 | 11.250,00 |
| carried forward | 87.737,60 | 392.666,65 |

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | US$ | US$ |
| brought forward | 87.737,60 | 392.666,65 |

*Adjusters' Note –   The attendance of the superintendent was helpful for a more economical management of the case and eventually resulted beneficial also for the H & M Underwriters. As stated by the Surveyor the permanent repairs lasted 15 days in the whole. This latter period only is therefore taken into consideration, based upon a daily rate of US$ 750/day (inclusive of expenses) which is in line with the tariff usually applied in the adjusting practice for similar intervention. It is further noted that no works per Owners' account (except some minor interventions) were concurrently carried out during the stay at Karanlik Liman anchorage area.*

### 13. D I T T O

| | | |
|---|---|---|
| Office expenses for communication, copies, assistance to H & M Surveyor etc........................................................ US$   10.000,00 | 8.200,00 | 1.800,00 |

*Adjusters' Note – Cl. 17 of the I.T.C.H. (ed. 1.10.83) expressly excludes any remuneration to the Assured for time and trouble taken to obtain and supply information or document in connection with the casualty. The assistance to the Surveyor is a typical example of this. The claim is consequently allocated into remainder except for a minor proportion referring to the sole out*

| carried forward | 95.937,60 | 394.466,65 |
|---|---|---|

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | US$ | US$ |
| brought forward | 95.937,60 | 394.466,65 |

*of pocket (postage, fax, telephone, etc.) incurred in dealing with the case.*

**14. COASTAL SAFETY AND SALVAGE CO.**

For salvage remuneration in respect of the services rendered by the m/t. "SONDUREN 5" in favour of m/v. "BERIL 1" on the 3rd January 2009 .................................................... US$  50.000,00                    50.000,00

*Adjusters' Note – See Adjusters' Explanatory note, item no. 3.*

Brought down to page 23          ....................................................     95.937,60     444.466,65

19

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | YTL | YTL |

### CLAIMS IN YTL

**15. TURK LOYDU – TUZLA**

Invoice no. 920065 dd. 12.01.2009

intervention for SMS audit ................................ YTL   2.650,00          2.650,00

*Adjusters' Note –   Claim not connected with the casualty. Reference is requested to page 30 of the Survey Report.*

**16. D I T T O**

Invoice no 920064 dd. 12.01.2009

fee/expenses for occasional survey rendered in   connection   with the casualty ....................................... YTL   1.055,00          1.055,00

*Adjusters' Note – The claim refers to the attendance of the class surveyor upon completion of the repairs. The relevant amount approved by Messrs Studio Ansaldo, is allowed in particular average as part of the reasonable cost of the repairs.*

**17. PILOTAGE TUGBOAT MOORINGBOT – ISTANBUL**

Invoice no. 815225 dd. 22.01.2009

pilot service ....................................... YTL   730,46          730,46

carried forward                                       2.650,00       1.785,46

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | YTL | YTL |
| brought forward | 2.650,00 | 1.785,46 |

*Adjusters' Note – Claim connected with the particular average damage repairs.*

### 18. KIYI EMNIYETI – ISTANBUL

Invoice no. 346066 dd. 16.1.2009

light dues for entering Marmaras Sea and exiting from Dardanelles (15.12.2008) ........................................... YTL    670,59    670,59

*Adjusters' Note – The claim refers to expenses incurred on 15th December 2008 i.e. before the captioned casualty (2.1.2009). The relevant amount is excluded. In this respect reference is also requested to the H & M Surveyor note (page 31).*

### 19. TURKIYE DENIZALIK ISLETMELERE – ISTANBUL

Invoice no. 00040 – 00198 dated 15.1.2009

anchorage dues in the Dardanelles on 7.1.2009 ........................
................................................................... YTL    992,72    992,72

| carried forward | 3.320,59 | 2.778,18 |

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | YTL | YTL |
| brought forward | 3.320,59 | 2.778,18 |

*Adjusters' Note – After the casualty the vessel was shifted to an anchorage in the Dardanelles (location named "Karanlink Liman") where the preliminary surveys were carried out. The relevant amount is charged in full to the underwriters.*

| | | |
|---|---|---|
| | 3.320,59 | 2.778,18 |
| | US$ | US$ |
| exchanged at the rate of US$ = YTL 1,5967 ruling at the date of issuing the Adjustment ............................................................ | 2.079,66 | 1.739,95 |
| Brought down to page 23 ...................................................... | 2.079,66 | 1.739,95 |

## SUMMARY OF CLAIMS

| m/v. "BERIL 1" | Remainder | Particular Average |
|---|---|---|
| | US$ | US$ |
| Brought down from page 19 ............................................... | 95.937,60 | 444.466,65 |
| Brought down from page 22 ............................................... | 2.079,66 | 1.739,95 |
| REMAINDER ................................................................ | 98.017,26 | |
| | | 446.206,60 |
| less deductible in terms of policy ............................................................ | | -75.000,00 |
| NET INDEMNITY DUE TO THE ASSURED ............................................. | | 371.206,60 |
| of which: | | |
| - covered by Lloyd Italico (20%) ............................................................. | | 74.241,32 |
| - covered by the other market (80%) ......................................................... | | 296.965,28 |
| | | 371.206,60 |

23

APPORTIONMENT

**Italian Market 20%**

LLOYD ITALICO Div. Toro Ass.ni  ...............   20,00%   US$   74.241,32   US$   74.241,32

**Other Markets 80%** (through Messrs Sipex)

HEMISPHERE ..................................................   40,00%   US$   148.482,64

MILITARY  ...................................................   25,00%   "   92.801,65

INDIA INTERNATIONAL  INSURANCE ....   10,00%   "   37.120,66

INTERNATIONAL GIORDAN INSURANCE   5,00%   "   18.560,33

US$   296.965,28   "   296.965,28

US$   371.206,60

SPESE DI GESTIONE

| | Spese dei Coassicuratori | Spese della Delegataria |
|---|---|---|
| | € | € |
| **STUDIO TECNICO NAVALE ANSALDO** | | |
| Per onorari e spese peritali ..................................... €     9.750,00 | 9.750,00 | |
| **SIPEZ    INSURANCE    &    REINSURANCE BROKER - MANNO** | | |
| Per competenze e spese di intervento...................... €     1.248,00 | 1.248,00 | |
| **STUDIO DOTT. GIORGIO CAVALLO** | | |
| Per onorari e spese di liquidazione.......................... €     7.854,00 | 7.854,00 | |
| **COMMISSIONE** per l'esercizio della delega ........ €   13.720,00 | | 13.720,00 |
| | 18.852,00 | 13.720,00 |

R I P A R T O

*Mercato Italiano*

LLOYD ITALICO ................................................................... 20%  €    2.744,00

*Altri mercati* ........................................................................ 80%  "   10.976,00

                                                                          €   13.720,00

Genova, 8 Maggio 2009

Studio Dott. Giorgio Cavallo

*Associazione Professionale*

EXHIBIT 3

MANAGEMENT EXPENSES

| | Coinsurers Expenses | Claims Leader Expenses |
|---|---|---|
| **Marine Technical Firm** | | |
| Fees and survey expenses..................... | € 9.750,00 | 9.750,00 |
| **Sipex Insurance and Reinsurance Broker – Manno** | | |
| Duties and intervention expenses........ | € 1.248,00 | 1.248,00 |
| **Dott. Giorgio Cavallo** | | |
| Fees and liquidation expenses............... | € 7.854,00 | 7.854,00 |
| **Commission for the activity of claim leader** | | |
| ............................................................... | € 13.720,00 | | 13.720,00 |
| | 18.852,00 | 13.720,00 |

APPORTIONMENT

*Italian Market*

LLOYD ITALICO.................................................................................     20%     € 2.744,00


*Other Markets*............................................................................     80%     € 10.976,00

                                                      ————————

                                                      € 13.720,00


Genoa, 8th May 2009

                                                  Studio Dott. Giorgio Cavallo

                                                      *Professional Association*

EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
EMRE GEMICILIK DENIZCILIK TIC. LTD. STI.,

                                    Plaintiff,            09 CV

-v-
                                                    **ATTORNEY'S DECLARATION**
MILITARY INSURANCE COMPANY,                         **THAT DEFENDANT CANNOT BE**
                                                    **FOUND IN THE DISTRICT**

                                    Defendant.
-----------------------------------------------------------------x

      This declaration is executed by **George M. Chalos, Esq.**, counsel for the Plaintiff,

EMRE GEMICILIK DENIZCILIK TIC. LTD. STI., in order to secure the issuance of a

Summons and Process of Maritime Attachment and Garnishment in the above-entitled, in

personam, Admiralty cause.

      Pursuant to 28 U.S.C. §1746, **George M. Chalos, Esq.**, declares under the penalty of

perjury:

      I am a Member of the firm of CHALOS & CO, P.C., attorneys for Plaintiff in the above

referenced matter.

      I am familiar with the circumstances of the Verified Complaint, and I submit this

declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment

and Garnishment of the property of the defendant, MILITARY INSURANCE COMPANY,

pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the

Federal Rules of Civil Procedure.

      I have personally inquired or have directed inquiries into the presence of the defendant in

this District.

      I have personally checked with the office of the Secretary of State of the State of New

York, using the Secretary of State's Division of Corporations database, and I have determined

that, as of September 1, 2009, the defendant is not incorporated pursuant to the laws of New York, and have not nominated any agent for the service of process within the Southern District of New York.

I have inquired of Verizon Telephone Company whether the defendant can be located within this District. The Verizon Telephone Company has advised me that the defendant does not have any telephone number listings within this District.

I have further consulted with several other telephone directories on the internet, and I have found no separate telephone listings or addresses for the defendant within this District.

I have engaged in a Google search as to whether the defendant can be located within this District. The Google search results did not provide any information that defendant is found in this District.

I am unaware of any general or managing agent(s) within this District for the defendant.

In that I have been able to determine that the defendant has not appointed an agent for service of process within the Southern District of New York and that I have found no indication that the defendant can be found within this District for the purposes of Rule B, I have formed a good faith belief that the defendant does not have sufficient contacts or business activities within this District and does not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon my own investigation that the defendant, MILITARY INSURANCE COMPANY, cannot be found within this District for the purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

Dated: Oyster Bay, New York
September 1, 2009

>
> CHALOS & CO, P.C.
> Attorneys for Plaintiff
> EMRE GEMICILIK DENIZCILIK TIC. LTD. STI.
>
> By: _____
>
> George M. Chalos (GC-8693)
> 123 South Street
> Oyster Bay, New York 11771
> Tel: (516) 714-4300
> Fax: (866) 702-4577
> Email: gmc@chaloslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
EMRE GEMICILIK DENIZCILIK TIC. LTD. STI.,

                           Plaintiff,                         09 CV

-v-

                                            **VERIFICATION OF**
MILITARY INSURANCE COMPANY,            **COMPLAINT**
                           Defendant.
-------------------------------------------------------------------x

       Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of perjury:

       1.    I am a Member of the law firm of CHALOS & CO, P.C., counsel for the Plaintiff, EMRE GEMICILIK DENIZCILIK TIC. LTD. STI., herein;

       2.    I have read the foregoing Verified Complaint and know the contents thereof; and

       3.    I believe the matters to be true based on documents and information obtained from employees and representatives of the Plaintiff through its agents, underwriters and attorneys.

       4.    The reason that this verification was made by deponent and not by the Plaintiff is because Plaintiff is a foreign corporation, whose officers are not in this district, and whose verification cannot be obtained within the time constraints presented by the circumstances of this case.

       I declare under penalty of perjury that the foregoing is true and correct.

Dated: Oyster Bay, New York
       September 1, 2009

                               CHALOS & CO, P.C.
                               Attorneys for Plaintiff
                               EMRE GEMICILIK DENIZCILIK TIC. LTD. STI.

By:                      _____
                               George M. Chalos (GC-8693)
                               123 South Street
                               Oyster Bay, New York 11771
                               Tel: (516) 714-4300
                               Fax: (866) 702-4577
                               Email: gmc@chaloslaw.com

Chalos & Co. Ref: 2161.001